**Cecil WREN et al.,**
**Plaintiffs–Appellees–Cross–Appellants,**

v.

**Nolan JONES et al.,**
**Defendants–Appellants–Cross–Appellees.**

**Nos. 79–2254, 79–2324, 80–1131, 80–1132.**

United States Court of Appeals,
Seventh Circuit.

Argued June 6, 1980.

Decided Dec. 10, 1980.

Rehearing and Rehearing En Banc
Denied March 12, 1981.

William S. Hanley, Springfield, Ill., for defendants–appellants–cross–appellees.

Robert L. Stern, Chicago, Ill., for plaintiffs–appellees–cross–appellants.

Before SWYGERT and CUDAHY, Circuit Judges, and GRANT, Senior District Judge.*

PER CURIAM.

This case involves allegations that twenty-six employees of the State of Illinois were discharged for political reasons in violation of their right to free association, due process and equal protection as guaranteed by the First and Fourteenth Amendments.

Plaintiffs are twenty-six state employees who, according to defendants, were necessarily "laid off;" twenty-five from the Illinois Department of Transportation (IDOT), and one from the Illinois Department of Mental Health (DMH). Defendants are either current or past officers or employees of the IDOT, DMH or Illinois Department of Personnel (IDOP).[1]

## I. Background

In 1969, a lawsuit captioned *Bradley, et al. v. Cellini, et al.*[2] was filed in an Illinois State Circuit Court. The *Bradley* case was a mandamus action by former employees who had been discharged in May of 1969 from the IDOT and DMH. In November of 1968, Miriam Ringo, the Director of Personnel under the administration of Governor Shapiro, a Democrat, had extended civil service protection, formally called Jurisdiction B of the Personnel Code, to the positions occupied by the *Bradley* plaintiffs. However, in January 1969, Richard B. Ogilvie, a Republican, became Governor, and in February of 1969 his Director of Personnel expunged former Director Ringo's extension of Jurisdiction B. Between April and June 1969, all Democratic employees in the IDOT maintenance and traffic units, ap-

proximately 3,000 workers, were discharged as "not acceptable to the agency" and were replaced by Republican workers. Twenty-five of the plaintiffs in the suit here before us were members of this group of discharged workers. On the other hand, the *Bradley* plaintiffs consisted of 27[3] maintenance and traffic workers from District 9 of the IDOT and three workers from the DMH who had been terminated by the Ogilvie administration.

On April 9, 1973, Illinois Circuit Judge Paul Verticchio issued an opinion holding that the termination of the *Bradley* plaintiffs was without cause, and contrary to the Personnel Code, as well as in violation of the rules of the Department of Personnel. Judge Verticchio thereupon held that the Ogilvie administration's expungement of the Jurisdiction B extension was "void and of no effect." As part of the court-ordered remedy, the heads of IDOT, DMH and IDOP were directed to:

> restore and return each of the [Bradley] Plaintiffs to the position and title held by such Plaintiff on the date of his discharge from said position or to discharge each Plaintiff in accordance with The Personnel Code and Rules of the Department of Personnel.[4]

That writ of Mandamus, entered May 30, 1973, added that "FAILURE TO DO SO WILL SUBJECT YOU TO PUNISHMENT FOR CONTEMPT OF THIS COURT."

While the *Bradley* litigation was pending, Governor Ogilvie's Director of Personnel on November 28, 1972, once again extended Jurisdiction B protection to the relevant positions. Coming full circle politically, the new Democratic administration of Governor

---

* Honorable Robert A. Grant, Senior District Judge of the United States District Court for the Northern District of Indiana, is sitting by designation.

1. Langhorne Bond, individually and as former Secretary to IDOT; the present Secretary of IDOT, John Kramer; the former administrative assistant to Bond, Brian Hannigan; IDOT District 9 assistant district engineer, Richard Miley; IDOT District 9 business manager, Donald Shelton; the former Director of IDOP, Nolan B. Jones; the present Director of IDOP, William R. Boys; IDOP chief field officer, Robert

Rhoads; an IDOP employee, David Knox; the present Director of DMH, Robert deVito; and the former administrative aid to the Director of DMH, Alfred P. Ronan.

2. Circuit Court of Sangamon County, No. 2795–69.

3. One of the plaintiffs chose not to return.

4. Judgment Order filed May 3, 1973 in Circuit Court, Sangamon County, No. 2795–69.

Walker, in November 1973, acting thru their new Director of Personnel and a defendant in the case at bar, again attempted to remove the positions from civil service coverage, but the Illinois Civil Service Commission refused to permit the removal. It is apparent that each successive administration, since 1968, has attempted to remove the patronage employees inherited from the former administration, place its own patronage people in those positions and then to extend civil service coverage to its own new employees.

In June of 1973, the State of Illinois was experiencing financial restrictions for fiscal year 1974 (July 1, 1973–June 30, 1974). The actual amount approved by the legislature for personnel services in the IDOT's Maintenance and Traffic Units was significantly smaller than had been requested.[5] Consequently, approximately 1,000 state employees were laid off in June 1973, 540 of whom were IDOT employees. In this restrictive fiscal setting,[6] the defendant State officials were faced with the *Bradley* court's mandate to reinstate twenty–five workers, or face the possible consequences of punishment for Contempt of the Sangamon County Circuit Court.

## II. Implementation

Under the *Bradley* order, the officials in charge of the IDOT and DMH were then confronted with the specter of having 50 employees to do work formerly performed by 25 employees. They determined that it was necessary to layoff a number of employees equivalent to the number of those returning *Bradley* plaintiffs. The parties have stipulated that but for the entry of the *Bradley* order, none of the plaintiffs in the case at bar were scheduled to be laid off for the fiscal year ending June 30, 1973. In selecting those employees for "lay off," the defendant Robert Rhoads, the Field Officer of the IDOP, made the initial determination

that those persons who actually replaced the *Bradley* plaintiffs in 1969 should be chosen. After consultation with Berwyn Hanley, an assistant to the Director of Personnel at the IDOP's downtown Springfield office; with Brian Hannigan, Assistant Secretary of the IDOT; Michael Waters, who served as liaison between the IDOP and the Illinois Attorney General's office; and Assistant Attorney General Lee Martin, the layoffs were implemented in the following fashion: in the IDOT, 15 persons who directly replaced the *Bradley* plaintiffs were found to still be in the positions formerly held by the *Bradley* plaintiffs; six persons were replacements for men who had actually replaced the *Bradley* plaintiffs in 1969; and, in four instances where the position could not be identified precisely, persons were laid off on a random basis from the returning *Bradley* plaintiffs' team section and class, with consideration given to performance. In the DMH, the last person hired was laid off. Thereafter these twenty–six employees (the Wren plaintiffs) filed the present action for damages and injunctive relief under 42 U.S.C. § 1983, alleging violation of their rights under the First and Fourteenth Amendments. The case was tried without a jury and during trial the defendants agreed to reinstate the plaintiffs pending final adjudication of the case. On August 4, 1978 the district court entered its Memorandum Order[7] finding that defendants had violated plaintiffs' Due Process and First Amendment rights and ordering the then incumbent agency heads, Kramer, Boys, and deVito, to reinstate the plaintiffs. The district court also found defendants Hannigan and Rhoads were individually liable to the plaintiffs discharged from the IDOT for violation of their First Amendment rights, but the court reserved judgment on the same question as to defendants Bond, Miley and Shelton. The court dismissed defendants Jones, Knox,

---

**5.** Approximately 10.4% below the proposed budget.

**6.** Although the district court made the general conclusion that "defendant's evidence does not establish to my satisfaction, that fiscal restraints required the layoff of a number of

current employees equivalent to the number of *Bradley* plaintiffs", 457 F.Supp. at 243, as developed below, we hold that finding to be clearly erroneous.

**7.** Reported at 457 F.Supp. 234.

and Ronan. On September 17, 1979, the district court entered an order assessing approximately $393,000 in damages against Rhoads and Hannigan, in addition to costs and attorney fees.

Defendants Hannigan and Rhoads have appealed the award of damages and defendants Boys, Kramer and deVito have appealed the reinstatement order. Plaintiffs have cross–appealed the dismissal of defendants Jones, Knox and Ronan as well as the failure to award overtime damages and the allocation of attorney fees. The State of Illinois, although not a party, has been permitted to file a brief as Amicus Curiae, wherein the arguments of defendants are supported.

### III.  First Amendment

As in the court below, plaintiffs present two First Amendment arguments. First, that their separation from State service was in furtherance of a patronage program, violating their right to free association under the rationale of *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) and *Illinois State Employees Union, Council 34 v. Lewis*, 473 F.2d 561 (7th Cir. 1972), *cert. denied*, 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973). Secondly, plaintiffs assert that defendants denied them re–employment opportunities in furtherance of a patronage program.

Initially, we will review those cases that have addressed the conflict between political patronage and the First Amendment.

In *Illinois State Employees Union, Council 34 v. Lewis, supra*, a group of state employees who held non–civil service, non–confidential positions were discharged by a new Republican Secretary of State in conjunction with the Ogilvie administration. The discharged employees sought reinstatement and backpay, alleging violation of the First and Fourteenth Amendments. The district court, however, entered summary judgment for the defendant state officials. In reversing and remanding for further proceedings, then Circuit Judge, now Justice Stevens, held that the dismissal of non–civil service public employees due to their political associations or beliefs constitutes a

violation of the First and Fourteenth Amendments. Judge Stevens commented on the burden of proof involved when First Amendment rights are partially curtailed:

> If the conditions attached to public employment merely involve some curtailment–as opposed to abject surrender–of First Amendment rights, interests of the State "if strong enough" may justify the condition. As a procedural matter, the burden of establishing such justification rests upon the defendant. In view of the importance which the Court has consistently attached to the First Amendment rights of the citizenry, that burden is a heavy one. Without such justification, the foregoing cases demonstrate that plaintiffs have alleged an impermissible basis for their discharge. We must therefore consider the matter of justification. (footnotes omitted)

473 F.2d 561 at 572–73. The majority vote on the *Lewis* panel came from Senior District Judge Campbell who filed a concurring opinion wherein he stated a much more restrictive allocation of the burden of proof:

> Another vexing and potentially troublesome problem which emerges from our ruling concerns the practical application of the burden of proof standard. It goes without saying, of course, that the burden belongs to and remains with the dismissed employee. It seems equally clear that since a civil service system may not be judicially imposed upon a state or local government, that a public employer cannot be compelled to explain the reasons for termination. Indeed, the imposition of such a "burden of explanation" would run counter to the precise holding of the Supreme Court in *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Thus, if a public employer desires to stand silent by way of a general denial to the employees' allegations, the employee must demonstrate by the clear and convincing weight of the evidence that his dismissal resulted solely because of his political associations. Such a burden is a heavy one but in my view is necessitated by the limited nature of the

right *Sindermann* compels us to recognize today–i. e., the right to be free from summary dismissal only where the dismissal is based solely upon a reason expressly proscribed by the First Amendment to the Constitution.

473 F.2d at 579.

In *Burns v. Elrod*, 509 F.2d 1133 (7th Cir. 1975), Republican deputy sheriffs brought suit for injunctive and other relief against the newly elected Democratic sheriff alleging they had been discharged in violation of the First Amendment, for the sole reason that they were not affiliated with or sponsored by the Democratic party. The district court denied their motion for preliminary injunction and dismissed the complaint. In reversing, this court, in an opinion by Senior District Judge Campbell, relied on *Lewis*, stating, "Although defendants argue that *Lewis* was wrongly decided and invite our reconsideration thereof, we decline to do so for the scholarly and persuasive reasons articulated in Judge Stevens' opinion in *Lewis*" (footnotes omitted). 509 F.2d 1133, 1135. This statement could be interpreted as a change in Judge Campbell's position on the burden of proof, although that burden of proof was not addressed in the *Burns v. Elrod* opinion. In *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), a plurality of the Supreme Court affirmed the Seventh Circuit in an opinion by Justice Brennan [8] which held that public employment, even when viewed as a privilege rather than an inherent right, cannot be conditioned on the surrender of constitutionally protected rights, i. e., that the practice of patronage dismissals imposes an unconstitutional condition on the exercise of the freedom of political association and belief. Justice Brennan, in attacking patronage practices in general, applied a high level scrutiny standard to determine whether a significant impairment of these First Amendment freedoms could be justified by countervailing state inter-

ests, expressly rejecting a rational basis analysis. 427 U.S. at 362, 96 S.Ct. at 2684. Justice Brennan summarized:

> In short, if conditioning the retention of public employment on the employee's support of the in–party is to survive constitutional challenge, it must further some vital government end by a means that is least restrictive of freedom of belief and association in achieving that end, and the benefit gained must outweigh the loss of constitutionally protected rights. (footnote omitted).

427 U.S. at 363, 96 S.Ct. at 2685.

The majority votes in *Elrod* came in Justice Stewart's concurrence [9] which expressed no view on the question of political hiring, and the consideration of patronage dismissals was limited:

> The single substantive question involved in this case is whether a nonpolicy-making, nonconfidential government employee can be discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground of his political beliefs. I agree with the plurality that he cannot. See *Perry v. Sindermann*, 408 U.S. 593, 597–598 [92 S.Ct. 2694, 2697–2698, 33 L.Ed.2d 570].

427 U.S. at 375, 96 S.Ct. at 2690.

In *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), the Court in a majority opinion by Justice Stevens [10] reaffirmed the plurality opinion in *Elrod*. *Branti* involved two assistant public defenders in Rockland County, New York, who sought an injunction to preserve their positions as assistant public defenders on the basis that the recently appointed Democratic County Public Defender was about to discharge them solely because they were Republicans. The district court permanently enjoined their termination, based as it was, upon the sole grounds of political belief, finding that the newly appointed Pub-

---

**8.** Justice Brennan was joined by Justices White and Marshall.

**9.** Justice Stewart was joined by Justice Blackmun.

**10.** Justice Stevens had not participated in the Seventh Circuit *Elrod* decision.

lic Defender intended to replace the complaining assistants with Democrats. Both the Second Circuit and the Supreme Court affirmed. Justice Stevens, writing for the majority, stated:

> If the First Amendment protects a public employee from discharge based on what he has said, it must also protect him from discharge based on what he believes. Under this line of analysis, unless the Government can demonstrate "an overriding interest," [citing *Elrod*] 427 U.S. at 368, 96 S.Ct. at 2687, "of vital importance," *id.* at 362, 96 S.Ct. at 2684, requiring that a person's private beliefs conform to those of the hiring authority, ·his beliefs cannot be the sole basis for depriving him of continued public employment. (footnote omitted).

100 S.Ct. at 1293.[11]

■ In all of the cases discussed above, the underlying fact was that the employees were or were about to be discharged solely on the basis of their political beliefs. In the case at bar, the initial inquiry must be whether the political association and beliefs of the Wren plaintiffs were the sole basis of their layoffs. The short and simple answer must be that the unusual facts of this case preclude a finding that there was such a sole basis. As the defendants point out, the *Bradley* order itself makes this case unique. In view of the fiscal restrictions, the fact that there were only Republicans in the affected units and the further fact that no Democrats were hired into similar full–time positions, requires a conclusion that any potential motivation was, at most, just one of the factors in their decision.

The issue now becomes: how much of a role must the plaintiffs' political association have played in the defendants' decision to engage in the layoffs in order to find a First Amendment violation. The district court answered that question and allocated the burden of proof by quoting the following passage from *Mt. Healthy City School District Bd. of Ed. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977).

Initially, in this case, the burden was properly placed upon respondent to show that his conduct was constitutionally protected, and this conduct was a "substantial factor"–or, to put it in other words, that it was a "motivating factor" [footnote omitted] in the Board's decision not to rehire him. Respondent having carried that burden, however, the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct.

*Mt. Healthy* involved an action brought by an untenured school teacher who claimed that a school board's refusal to renew his contract violated his First Amendment rights contending that his exercise of free speech had played a substantial role in the decision not to rehire. While the plaintiff prevailed on that theory in the district and circuit courts, the Supreme Court vacated and remanded the case for application of the above–quoted test. In explaining what the Court meant by "motivating factor," the case of *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) was cited. *Arlington Heights* did not involve a First Amendment challenge, but rather concerned an allegation that refusal to change the zoning of land to permit construction of racially integrated housing, violated the Equal Protection Clause. The court of appeals had reversed the district court, holding that the Village's refusal to rezone carried a racially discriminatory effect and was, without more, unconstitutional. In reversing, the Supreme Court commented on the role a racially discriminatory motive must play before a violation of the Equal Protection Clause will be proved:

> Our decision last Term in *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), made it clear that

---

11. *Branti* dealt with the question of whether certain employees had a confidential relationship with the employer which would justify a patronage dismissal. Such a factual question is not present in the case at bar.

official action will not be held unconstitutional solely because it results in a racially disproportionate impact. "Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination." *Id.* at 242, 96 S.Ct. at 2049. Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.

\* \* \* \* \* \*

*Davis* does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes. Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the "dominant" or "primary" one. In fact, it is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality. But racial discrimination is not just another competing consideration. When there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified. (footnotes omitted).

429 U.S. at 264–266, 97 S.Ct. at 563.

In summation, the Supreme Court stated:

Respondents simply failed to carry their burden of proving that discriminatory purpose was a motivating factor in the Village's decision. This conclusion ends the constitutional inquiry.

429 U.S. at 270–271, 97 S.Ct. at 566.

In *Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), the Court commented on its *Mt. Healthy* holding. *Givhan* involved a dismissed school teacher who sought reinstatement, partially on the grounds that her right of free speech had been infringed. Specifically, she had made comments on employment policies and practices at the school which she believed to be racially discriminatory. The Fifth Circuit reversed a district court finding that the dismissal violated the teacher's First Amendment rights. The Supreme Court, in reversing and in clarifying that its *Mt. Healthy* holding covered private communications between teacher and principal, first reviewed another case in which the Court faced the question of whether a public employee's exercise of free speech was protected. The *Givhan* Court recounted a balancing test used in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968):

In *Pickering* a teacher was discharged for publicly criticizing, in a letter published in a local newspaper, the school board's handling of prior bond issue proposals and its subsequent allocation of financial resources between the schools' educational and athletic programs. Noting that the free speech rights of public employees are not absolute, the Court held that in determining whether a government employee's speech is constitutionally protected, "the interests of the [employee], as a citizen, in commenting upon matters of public concern" must be balanced against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education, supra*, 391 U.S. at 568, 88 S.Ct. at 1734.

99 S.Ct. at 696. The *Givhan* Court further restated its test set down in *Mt. Healthy* and remanded the case for application of this test:

In that case [*Mt. Healthy*] this Court rejected the view that a public employee must be reinstated whenever constitutionally protected conduct plays a "substantial" part in the employer's decision to terminate. Such a rule would require reinstatement of employees that the public employer would have dismissed even if the constitutionally protected conduct had not occurred and, consequently, "could place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing." 429 U.S. at 285, 97 S.Ct. at 575.

Thus, the Court held that once the employee has shown that his constitutionally protected conduct played a "substantial" role in the employer's decision not to rehire him, the employer is entitled to show "by a preponderance of the evidence that it would have reached the same decision as to [the employee's] reemployment even in the absence of the protected conduct. *Id.* at 287, 97 S.Ct. at 576.

\*    \*    \*    \*    \*    \*

Since this case was tried before *Mt. Healthy* was decided, it is not surprising that respondents did not attempt to prove in the District Court that the decision not to rehire petitioner would have been made even absent consideration of her "demands." Thus, the case came to the Court of Appeals in very much the same posture as *Mt. Healthy* was presented in this Court. And while the District Court found that petitioner's "criticism" was the "primary" reason for the school district's failure to rehire her, it did not find that she would have been rehired but for her criticism.

99 S.Ct. at 697. Although the *Mt. Healthy* test was to be applied on remand in *Givhan*, the Second Circuit has recently decided that, at least in some instances, they prefer to apply the *Pickering* balancing test rather than the *Mt. Healthy* test. *Janusaitis v. Middlebury Volunteer Fire Dept.*, 607 F.2d 17, 25 (2d Cir. 1979).

In *Rosaly v. Ignacio*, 593 F.2d 145 (1st Cir. 1979), the First Circuit, facing a factual situation somewhat akin to the case at bar, applied the *Mt. Healthy* and *Givhan* holdings. In *Rosaly*, employees of the Puerto Rico Highway Authority alleged that their terminations were politically motivated, in violation of the First Amendment. The terminations occurred after the New Progressive Party lost the 1972 elections to the Popular Democratic Party. After a verdict and judgment for plaintiffs, the First Circuit reversed, holding that defendant officials must be given the opportunity, under the *Mt. Healthy* test, to prove that the terminations were necessitated by a financial crisis in the Highway Authority and were not due to their political affiliation:

The defendants maintained throughout the proceedings that the plaintiffs' terminations were necessitated by a financial crisis in the Highway Authority and were not due in any way to their political affiliation. This, then, was a *Mt. Healthy* claim. The court did not adequately treat this issue. It included in its findings of fact plaintiffs' compilation of employee statistics which indicated that after plaintiffs' discharges the Department of Transportation granted a number of raises and promotions. We acknowledge that circumstantial evidence maybe used to show discriminatory motive in a patronage dismissal case. *Gabriel v. Benitez*, 390 F.Supp. 988, 993 (D.P.R.1975), aff'd sub nom., *Rivera Morales v. Benitez de Rexach*, 541 F.2d 882 (1st Cir. 1976). However, the recital of these numbers alone does not establish conclusively a discriminatory motive, especially in light of the defendants' alleged economic justification for these increases, i. e., two of the employees who received salary increases did so because these employees took on additional duties after the integration, resulting in an overall savings in the department. But even if such evidence supports a finding of discriminatory motive, there was, as far as the record shows, no application of the *Mt. Healthy* test.

Although the record is lengthy, we do not feel that it provides the proper basis for us to make the factual determination called for in *Givhan, supra,* [439] U.S. [410] at [417], 99 S.Ct. 693 [at 697, 58 L.Ed.2d 619]. The *Givhan* decision adopted the procedural guidelines set out in *Mt. Healthy, supra,* 429 U.S. [274] at 287, 97 S.Ct. 568 [at 576, 50 L.Ed.2d 471], but articulated more precisely the test to be applied. Under *Givhan,* the initial burden is upon plaintiffs to show that their conduct was constitutionally protected. Plaintiffs must next establish that this conduct was a "substantial factor" or a "motivating factor" in defendants' decision to discharge them from the Highway Authority.

If that is proven, the defendants have the burden to show by a preponderance of the evidence that they would have reached the same decision notwithstanding the protected conduct. If the plaintiffs are to recover, the court (or jury) must expressly find that plaintiffs would not have been discharged "but for" the constitutionally immunized activity. *Givhan, supra,* [439] U.S. [410] at [417], 99 S.Ct. 693 [at 697, 58 L.Ed.2d 619]. See *Mack v. Cape Elizabeth School Board,* 553 F.2d 720, 722 (1st Cir. 1977).

593 F.2d at 148–149.

◼ In summary, under *Branti* and *Elrod,* if political association appears to be the sole basis for dismissal, then a strict scrutiny analysis should be applied. Where, as in the case at bar, political association was not the sole basis for a personnel transaction, the *Mt. Healthy* test should be applied to determine whether political affiliation was the motivating factor as defined in *Village of Arlington Heights.* However, as seen in *Givhan* and *Janusaitis,* application of the *Pickering* balancing test remains a possibility.

◼ Applying the *Mt. Healthy* test, as restated in *Rosaly, supra,* plaintiffs' "conduct" was simply their membership in the Republican party, and such political association is clearly constitutionally protected. However, the crucial burden is upon the plaintiffs to show that this conduct was the motivating factor in the layoff decision. Here we must determine whether the district court's finding that such conduct was the motivating factor is clearly erroneous. We now hold, from a review of the testimony and other evidence before the district court, the finding that plaintiffs have satisfied their burden of proving that political affiliation was the motivating factor in their discharge is clearly erroneous. To paraphrase the Supreme Court, plaintiffs have simply failed to carry their burden, and this conclusion must end the constitutional inquiry. Assuming *arguendo,* that

plaintiffs have satisfied the first part of the *Mt. Healthy* test, we find that the defendants have, by a preponderance of the evidence, established that fiscal restraints required a reduction in the affected units equivalent to the number of reinstated in *Bradley* employees, and that fiscal restraints justified the failure to reemploy the plaintiffs during the two year period after their layoffs. Therefore, although the same employees may not have been chosen, for example, had actual hire dates been used rather than the common seniority date of May 1, 1972,[12] the fact would remain that some of the employees in the affected units would have to be laid off. The fact that all potentially affected employees were Republican means that the Wren plaintiffs' political association was of no consequence, especially in light of the fact that no Democratic employees were hired into similar full-time positions in the same class[13] during the two year period following the dates of the layoffs.

If we were to apply the *Pickering* balancing test in this case, we must balance the slight (if existent) infringement of the Wren plaintiffs' First Amendment right to free political association versus the State's clear interest in promoting the efficiency of the public services it performs through its public employees. Unlike a discharge motivated by a school teacher's overt exercise of her right to free speech, e. g., *Givhan,* and unlike the blatant firing of employees of the same political party as a defeated incumbent, upon change in office, e. g., *Branti,* the Wren plaintiffs were Republicans chosen from a larger group that consisted solely of Republicans and there was no evidence adduced that the plaintiffs had engaged in any political speech or association, other than their being registered Republicans, which had given rise to the personnel actions. The intrusion upon the Wren plaintiffs' First Amendment freedoms was minimal, if existent.

---

12. The date when civil service protections were extended to employees in the affected units.

13. We are not persuaded that summer junior laborers or "ghost employees" are in the same class as the Wren plaintiffs.

Even assuming that there was a minimal intrusion, evaluating the State's interest to determine whether they are of greater weight, as stated before, the State has a clear interest in utilizing its financial resources in an efficient manner. In the final analysis, that is what this case comes down to, whether the State of Illinois should have employed the *Bradley* plaintiffs without any equivalent reduction in personnel. In view of the involuntary requirement that the *Bradley* plaintiffs be reinstated, and of the fiscal exigencies, we hold that the State's interest in maintaining prudent control over the efficient use of their resources outweighs any minimal impact on the plaintiffs' right to political association.

At this point, we should comment on the district court's heavy reliance on the history of patronage in Illinois politics. Although historical background is a proper factor in determining present motivation, *e. g., Arlington Heights, supra,* 429 U.S. at 267, 97 S.Ct. at 564, we believe that too great an emphasis was placed on this factor, and we are not persuaded that the political maneuverings of previous administrations, and even previous maneuverings of some of the Wren defendants, can be said to be the reason for the personnel actions here contested.

### IV. Due Process

The following procedures were utilized in the case at bar. On or about June 30, 1973, plaintiffs received notices of their layoffs which read: "Layoff occasioned by Judge Verticchio's order in No. 2795–69 in the Circuit of Sangamon County." Under the Personnel Rules, each plaintiff was entitled as a laid off certified employee to petition the Director of Personnel within 15 days of receipt of the layoff notice for a reconsideration of his decision approving the notice. As part of that procedure, the Director was required to "review and investigate the application of the personnel rules and validity of the layoff." Personnel Rule 2–596. Written notice to the employee of the final decision of the Director was required.

In the case at bar, defendants at first were confused about the jurisdiction of the IDOP to review the layoffs here because the actions occurred as the result of a court order. Some of the men laid off filed a mandamus action in the Circuit Court for Sangamon County seeking reinstatement. However, there was testimony to the effect that meetings were being scheduled as part of the reconsideration procedure for all of the laid–off employees who requested them. Such a meeting for plaintiff Patterson was held on September 28, 1973. Defendant Jones upheld Patterson's layoff and sent written notice of his decision to Patterson's attorney. No other meeting had been held when this action was commenced on October 18, 1973, and the parties stipulated that none would be held during the pendency of this litigation.

In finding that there was a violation of plaintiffs' due process rights which justified injunctive relief, the court below stated:

Under the unique circumstances of this case, I believe that plaintiffs' rights to due process of law were violated. The defendants' response to the *Bradley* order, and the manner in which *Bradley* was implemented established the plaintiffs here as necessary parties to the *Bradley* litigation. They were not made party and thus were unable to protect the interest they had in their employment. They were denied due process of law.

457 F.Supp. at 239.

Plaintiffs contend here, as in the trial court, that, as certified employees they had a property interest protected by due process, that this property interest could not be terminated without adequate notice and a prior hearing, and that the prior hearing to which they were entitled was either a judicial hearing in the context of being parties to the *Bradley* case itself, a predismissal administrative hearing, or the discharge proceedings provided under the Illinois Personnel Code.

■ Initially, we hold that the district court erred in finding that the Wren plaintiffs were necessary parties to the *Bradley* proceeding, and that they were denied due process by not being joined. During the four year history of the *Bradley* proceeding, it would have been impracticable to join as parties every possible employee who might

have been affected by the *Bradley* order. There would have been hundreds of potentially affected workers, with no certain way of determining which, if any, would have to be laid off. *Cordes v. Isaacs*, 27 Ill.2d 383, 189 N.E.2d 236 (1963), stands for the proposition that incumbent employees are not necessary parties to a proceeding for reinstatement of a former employee if the reinstatement proceeding would not adjudicate the employment rights of the incumbents. Such is the case here, in that the employment rights of the Wren plaintiffs were not adjudicated in the *Bradley* proceeding. Only upon implementation by the defendant State officials did the *Bradley* order first affect the Wren plaintiffs. In *Powell v. Jones*, 56 Ill.2d 70, 305 N.E.2d 166 (1973), the Illinois Supreme Court held that an employee discharged for cause is entitled to more extensive procedures (*e. g.*, Ill.Rev. Stat.Ch. 127, 63b111) than is an employee laid off for financial reasons (*e. g.*, Personnel Rules 2–596). The *Powell* court described the post–layoff procedures that are available in cases such as the one at bar, and held that ordinarily there is no right to a hearing before a layoff. This court has previously followed the *Powell* decision. *Mims v. Board of Education*, 523 F.2d 711, 715 (7th Cir. 1975). We note that the *Powell* court specifically limited its holding to situations that did not involve allegations of political motivation. 56 Ill.2d at 74, 305 N.E.2d at 168. However, where political allegations have been found to be without merit, we will not grant relief for failure to provide a pre–layoff hearing. We hold that no pre–layoff hearing was required.[14] In so ruling, we are mindful of the limited role a federal court must take in judging the procedures afforded a state employee in personnel transactions. *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976).

### V. Conclusion

We find no merit in plaintiffs' equal protection and substantive due process argu-ment, and our decisions above moot the issues raised in plaintiffs' cross–appeal.

REVERSED AND REMANDED to the District Court for further proceedings in accordance with this opinion.

---

14. Plaintiffs ·appellees claim they were denied the right to post-layoff hearings, and request that these hearings be resumed or damages awarded for this failure. We do not reach or consider these contentions, leaving it to the informed discretion of the trial judge to determine what further proceedings, if any, are required.