724 F.2d 1083
 1 Fed.R.Serv.3d 1009
 John M. BEVER, Clearyl Davis, John E. Ellifritt, Cecil
Fling, Drexeline Perrine, Francis D. Radcliff,
Robert W. Robinson, Michael Shepherd,
Larry Williams and Larry W.
Griffin, Appellees,
v.
Walter GILBERTSON and Charles L. Miller, Appellants,
and
John Gum, Wilton Williams, individually and as Commissioner
of the West Virginia Department of Highways; and John D.
Rockefeller, IV, individually and as Governor of the State
of West Virginia, Defendants.
John M. BEVER, Clearyl Davis, John E. Ellifritt, Cecil
Fling, Drexelene Perrine, Francis D. Radcliff,
Robert W. Robinson, Michael Shepherd,
Larry Williams and Larry W.
Griffin, Appellees,
v.
John D. ROCKEFELLER, IV, Appellant,
and
John Gum, Walter Gilbertson, Wilton Williams, Charles L.
Miller, individually and as Commissioner of the
West Virginia Department of Highways, Defendants.
 Nos. 83-1790, 83-1791.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 5, 1983.
Decided Jan. 11, 1984.
 
 Robert B. King, Charleston, W.Va. (Rebecca A. Betts, King, Betts & Allen, Charleston, W.Va., on brief), for appellant John D. Rockefeller, IV.
 David P. Cleek, Deputy Atty. Gen., Charleston, W.Va. (Chauncey H. Browning, Jr., Atty. Gen., Edward W. Eardley, Steptoe & Johnson, Charleston, W.Va., on brief), for appellants Charles L. Miller and Walter L. Gilbertson.
 Timothy N. Barber, Charleston, W.Va. (Guy R. Bucci, Charleston, W.Va., on brief), for appellees.
 Before WINTER, Chief Judge, HALL, Circuit Judge, and HAYNSWORTH, Senior Circuit Judge.
 HAYNSWORTH, Senior Circuit Judge:
 
 
 1
 In 1981, West Virginia's Department of Highways allegedly was confronted with the need to substantially cut its expenditures. It chose to terminate the employment of a large number of lower echelon employees. According to plaintiffs, the sole or principal criterion for the selection of those to be terminated was political party affiliation. Loyal Democrats were to be retained while Republicans and Independents were to be terminated.
 
 
 2
 There are now pending in the Northern and Southern Districts of West Virginia a number of cases brought by terminated employees of the Department of Highways alleging that their terminations were in violation of their constitutional rights of free association. The plaintiffs in this case are such terminated employees who worked under the supervision of John Gum, County Supervisor for the Department of Highways in Doddridge County. The defendants are Governor John D. Rockefeller, IV, Charles L. Miller, Commissioner of West Virginia's Department of Highways, Walter Gilbertson, District Engineer of District 4 of the Department of Highways, Gum and Wilton Williams, Chairman of Doddridge County Democratic Executive Committee. The amended complaint sought injunctive relief, including reinstatement of the plaintiffs to their former jobs, and damages. Governor Rockefeller, Commissioner Miller and District Engineer Gilbertson were sued both in their official and individual capacities, and they claim qualified immunity from the claim of damages against them personally. The immunity claim was the basis of a motion for summary judgment. The motion was denied by the district judge largely on the basis that those defendants could not reasonably have believed that a political criterion for the selection of those employees whose employment was to be terminated was permissible under the Constitution of the United States.
 
 
 3
 Those three defendants sought a certificate by the district judge for a permissible interlocutory appeal under 28 U.S.C.A. Sec. 1292(b). The district judge refused such certification, whereupon those three defendants filed notices of appeal under 28 U.S.C.A. Sec. 1291. The question now before us, upon a motion to dismiss the appeals, is whether these appeals are within the collateral order exception to the general rule that appeals of right are allowable only from final judgments.
 
 I.
 
 4
 As developed in Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528, and subsequent cases in the Supreme Court, an appeal from an interlocutory order under Sec. 1291 may be taken, if the interlocutory order conclusively determines the question in the trial court, resolves an important question independent of the subject matter of the litigation, is effectively unreviewable on appeal from a final judgment or so important that review should not wait upon final judgment, and presents a serious and unsettled question upon appeal.
 
 
 5
 In Cohen itself, the plaintiffs were small shareholders who brought a derivative stockholders' action within the diversity jurisdiction of the federal courts. The defendants, faced with the prospect of large litigation expenses, sought an order compelling the plaintiffs to post security for them under a state statute which required the plaintiffs to reimburse the defendants for such expenses in the event that the defendants prevailed. The district court denied the motion to compel the posting of such security.
 
 
 6
 It is obvious that in Cohen, if an immediate appeal was not available and the case proceeded to final judgment, the defendants would have lost irretrievably the security they sought to gain by the motion, and the purpose of the statute imposing the burden of costs upon the losing plaintiffs would have been substantially frustrated.
 
 
 7
 Orders denying claims of absolute immunity have been held within the Cohen collateral order exception. In Helstoski v. Meanor, 442 U.S. 500, 99 S.Ct. 2445, 61 L.Ed.2d 30 (1979), the claim was one of immunity under the Speech and Debate Clause. In Abney v. United States, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977), the claim was one of immunity under the Double Jeopardy Clause, while in Nixon v. Fitzgerald, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982), the claim was one of absolute immunity for the President of the United States.
 
 
 8
 Claims of absolute official immunity are rightfully classified with claims of immunity under the Double Jeopardy Clause and the Speech and Debate Clause. In each instance, an important aspect of the absolute immunity with which the person is clothed is that he not be put to trial at all, and the right not to be put to trial at all is irrevocably lost if an order putting such a person to trial may not be reviewed until after final judgment.
 
 
 9
 The qualified immunity, with which the three appellants are cloaked, is of a lower order. It provides substantial protection for a public official who acts under circumstances in which a reasonable person would believe that his conduct did not violate established constitutional rights of another. That such a defendant not be put to the trouble of defending himself on the merits is also an aspect of immunity. Indeed, in Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396, the Supreme Court sought to give additional protection against being put to trial on insubstantial claims to persons possessing qualified immunity. It eliminated the subjective aspect of the qualified immunity doctrine as theretofore understood so that more claims of qualified immunity could be resolved on motions for summary judgment before trial.
 
 
 10
 It is far from clear, however, that an order denying a claim of qualified immunity is within the collateral order exception. While the Supreme Court in Harlow v. Fitzgerald considered the contours of qualified immunity, the case got there because the order in the district court denied Harlow's claim of absolute immunity. See, note 11, 457 U.S. at 806, 102 S.Ct. at 2732. In McSurely v. McClellan, 697 F.2d 309 (D.C.Cir.1982), the court held that an order denying a claim of qualified immunity was within the collateral order exception, a position with which a panel of this court (Judges Hall, Murnaghan, and Haynsworth) differed in an unpublished opinion in Benford v. American Broadcasting Companies, Inc., 707 F.2d 504 (4th Cir.1983).
 
 
 11
 Whatever the situation might be in other circumstances, however, the qualified immunity claimed by these three appellants cannot prevent their being put to trial. The plaintiffs seek equitable relief as well as money damages, and the appellants have no immunity from being put to trial on the equitable claims.[1] They are the principal defenders of the state's position. They will bear a major responsibility for the outcome of the litigation and will be among the principal witnesses at the trial. Whether or not they are immune from an assessment of damages against them in their individual capacities, the litigation will demand their time and attention. A present declaration of immunity from damage claims cannot avoid the diversion of their attention from other official duties which the litigation will occasion.
 
 
 12
 If the personal pocketbooks of the three appellants are, or may be, at risk, the degree of their distraction from other official duties may be greater than it otherwise would be. Still, one would suppose that, if the risk of personal liability were eliminated, the three, as responsible public officials, would give the litigation all of the thought and attention necessary adequately to protect the interest of the state.
 
 
 13
 The doctrine of qualified immunity cannot protect a public official from a claim of personal liability. It may provide a means by which the litigation may be terminated sooner than it otherwise might be, and it provides the official with substantive protection against personal liability for official wrongs other than a violation of established constitutional rights. In this case, however, a trial had been scheduled, and, if these appellants had nothing to do with the selection process and bore no responsibility for it, as they claim, they might have obtained a favorable judgment on the claims against them individually sooner by a trial on the merits than by appellate litigation of their immunity claims.
 
 
 14
 In these circumstances, the question whether a denial of the immunity claims is appealable before trial and final judgment, would appear to have little effect upon the willingness of responsible persons to serve in public office. That is one of the reasons for the existence of the doctrine of qualified immunity, and a claim of personal liability on the part of a public official should be adjudicated with reasonable promptness. Here, however, trial on the merits is at hand, and the appellants can look forward to prompt vindication of their positions if they are correct in their claims that they were not participants in the selection process and were not otherwise responsible for it.
 
 
 15
 If the question of qualified immunity is still in the case after final judgment in the district court, it may readily be reviewed in an appeal from that judgment.
 
 
 16
 Generally, in the Supreme Court the collateral order exception has been confined to situations in which the claimed right would be lost or deprived of its practical value if immediate review is not provided. This is true in absolute immunity cases in which the defendant is entitled not to be put to trial. Other preliminary orders of great importance to the litigants have been held not within the doctrine. Pretrial discovery orders may not be reviewed before final judgment. Cobbledick v. United States, 309 U.S. 323, 60 S.Ct. 540, 84 L.Ed. 783 (1940), and United States v. Ryan, 402 U.S. 530, 91 S.Ct. 1580, 29 L.Ed.2d 85 (1971). An order denying class certification is not within the doctrine. Coopers & Lybrand v. Livesay, 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978). Nor is an order refusing to disqualify counsel. Firestone Tire & Rubber Co. v. Risjord, 449 U.S. 368, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981). Litigants may desire early appellate rulings on important orders of that sort, but the collateral order exception is a narrow one and reserved for rare cases. Such a one was Mercantile National Bank v. Langdeau, 371 U.S. 555, 83 S.Ct. 520, 9 L.Ed.2d 523 (1963), where the question was one of venue in protracted litigation against two national banks which asserted a right not to be put to trial at all in the court in which the action had been brought. The question of venue is subject to appellate review after final judgment, but the court was moved by the specter of the great waste that would occur if the extensive litigation were permitted to proceed in the wrong court.
 
 
 17
 There are no comparable circumstances here. There is no problem of jurisdiction or venue in the district court. The trial must proceed in any event, and the question of qualified immunity is readily subject to appellate review after final judgment.
 
 
 18
 In the lower federal courts, orders denying claims of absolute immunity have been held appealable before trial. Chavez v. Singer, 698 F.2d 420, 421 (10th Cir.1983); Forsyth v. Kleindienst, 599 F.2d 1203, 1208-1209 (3d Cir.1979), cert. denied, 453 U.S. 913, 101 S.Ct. 3147, 69 L.Ed.2d 997 (1981) (Forsyth I ); Forsyth v. Kleindienst, 700 F.2d 104 (3d Cir.1983) (Forsyth II ). In Forsyth I, an interlocutory appeal from an order denying a claim of qualified immunity was not allowed, and the court said it was not even seriously contended that those orders met the Cohen requirements. In Forsyth II, the majority expressed skepticism about the appealability of the denial of summary judgment on the claim of qualified immunity referring to the Supreme Court's decision in Harlow v. Fitzgerald and the decision of the United States Court of Appeals for the District of Columbia Circuit, mentioned above, in McSurely v. McClellan. By eliminating the subjective component of the qualified immunity claim, the Supreme Court clearly intended to facilitate disposition of claims of qualified immunity on summary judgment motions, but one must read much into that opinion to conclude that the Supreme Court also intended that denials of such motions should be immediately appealable. If, however, it may ultimately be determined that such an order is immediately appealable if the effect of the immunity claim would be to terminate the litigation insofar as the immune defendant is concerned, this case is different. Partial summary judgment for these appellants on the damages claims against them individually would not terminate the litigation nor avoid the necessity for a trial and active participation in it by these appellants. Under these circumstances, we cannot read Harlow v. Fitzgerald as a basis for a conclusion that this denial of summary judgment meets the Cohen requirements.
 
 II.
 
 19
 There is another reason for dismissal of this appeal as premature.
 
 
 20
 One of the requirements for immediate appealability of a collateral order under the Cohen doctrine is that it present a serious and unsettled question of law. A public official, clothed with qualified immunity, is not required to anticipate future development of constitutional doctrine, but he is required to respect the established constitutional rights of others. His qualified immunity is not available to him if he does not do that.
 
 
 21
 In 1981, when these plaintiffs were terminated as employees of the Department of Highways, their constitutional right not to be discharged solely because of their political affiliation was clearly established. Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). The plaintiffs were not confidential employees nor policy makers. Indeed, there is no contention here that they are not the kind of employees who enjoy the protection of the Elrod-Branti principle.
 
 
 22
 Instead, the defendants contend that their discharge was not solely because of the lack of affiliation with the Democratic Party. It was for economic reasons, they say.
 
 
 23
 We may accept the fact that in 1981 fiscal considerations made a reduction in force in the Department of Highways necessary or appropriate. The decision that a reduction in force is necessary, however, was only a backdrop. It did not identify those employees to be terminated or those to be retained. It only set the stage for those specific employment decisions which would identify those employees who were to be released and would effect their actual terminations. The Elrod-Branti principle fully protected all of the lower echelon employees of the Department as their superiors approached the task of implementation of the reduction in force.
 
 
 24
 It is true that in both Elrod and Branti the patronage system had been operating to procure the discharge of members of an unfavored party to replace them with members of a favored party. Proof that the discharges were solely for political purposes may be facilitated when there are immediate replacements by members of a favored party, but the Constitution protects the rights of existing employees against discharge solely for political reasons. If, in the implementation of a reduction in force, those employees to be released are selected not on the basis of the quality of their work, their productivity or their faithfulness to their jobs but solely on the basis of their political affiliations, the Elrod-Branti principle is clearly applicable. The plaintiffs' allegations bring them readily within the principle.
 
 
 25
 The defendants place major reliance on Wren v. Jones, 635 F.2d 1277 (7th Cir.1980), but that case is of no assistance to them. In that case, a court had ordered the reinstatement of a number of Democrats who had been discharged solely for political reasons. The affected departments of the State of Illinois discharged a number of Republicans in order to make room for the Democrats to be reinstated. Considerations of fiscal limitations and efficiency militated strongly against the employment of both groups. In that case, however, the pool from which the employees to be terminated were selected was composed entirely of Republicans. Republican affiliation was not the criterion of selection, and it was properly concluded that economic necessity was the reason for their termination.
 
 
 26
 Wren is thus nothing like this case where the allegation is that party affiliation was the sole criterion by which these plaintiffs were selected for discharge. At least so far, this is not a mixed motive case. Economic considerations may have occasioned the reduction in force. They did not dictate, or even address, the political criterion by which those to be discharged allegedly were chosen.
 
 III.
 
 27
 Because this collateral order is not within the Cohen exception to the rule that appeals of right may be taken only from final judgments, the appeal is dismissed.
 
 
 28
 APPEAL DISMISSED.
 
 K.K. HALL, Circuit Judge, dissenting:
 
 29
 I cannot accept the majority's dismissal of these appeals as interlocutory. In concluding that pre-trial review is unavailable, the majority has ignored both the facts of this case and applicable law. In my view, the district court's order, denying appellants' claims of qualified immunity, is precisely the type of preliminary ruling which necessitates immediate appellate review. For this reason, I must dissent.
 
 I.
 
 30
 This case is one of nine civil actions currently pending against West Virginia's Governor Rockefeller, Department of Highway (DOH) Commissioner Miller, and various DOH District Engineers for their alleged participation in a conspiracy to terminate some sixty former DOH employees for political reasons. In this case, as in the others, plaintiffs are Republicans and Independents, who seek to hold Governor Rockefeller, a Democrat, and other state officials personally liable for monetary damages. The state defendants deny that they are liable for damages because of their entitlement to qualified or "good faith" immunity.
 
 
 31
 In the proceedings below, Governor Rockefeller, Commissioner Miller, and District Engineer Gilbertson moved for summary judgment based on their official immunity. The parties agree that the matter was ripe for summary disposition and that no facts regarding the immunity claim remain unresolved. According to the uncontradicted evidence, neither Governor Rockefeller nor the other two appellants were personally involved in the selection of these nine plaintiffs for termination. Moreover, the record also clearly establishes that none of the three at any time considered, suggested, authorized, or otherwise intended that the terminations be politically motivated. Finally, as plaintiffs concede, it is clear that the terminations arose as a result of an economically necessitated reduction in force.[1] Notwithstanding these undisputed facts, the district court denied the motions for summary judgment and these appeals followed.
 
 
 32
 In my view, the majority erroneously holds that the appeals from the denial of summary judgment must await the outcome of the trial. Under 28 U.S.C. Sec. 1291 only appeals from final judgments are ordinarily permitted. Nevertheless, as the majority notes, an exception to this general rule, known as the collateral order doctrine, has been recognized by the Supreme Court in Cohen v. Beneficial Industrial Loan Corporation, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), and other cases. To fall within the collateral order exception, the order appealed from must: (1) conclusively determine the disputed question; (2) resolve an important issue completely separate from the merits of the action; (3) be effectively unreviewable on appeal from a final judgment; and (4) present a serious and unsettled question on appeal.
 
 
 33
 In the companion cases of Nixon v. Fitzgerald, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982), and Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court recognized the applicability of the collateral order doctrine to both absolute and qualified immunity claims and the need for pre-trial appellate review of the denial of such claims. Other Circuit Courts, applying Harlow, have affirmed the appropriateness and need for immediate review of official immunity claims. Chavez v. Singer, 698 F.2d 420, 421 (10th Cir.1983); McSurely v. McClellan, 697 F.2d 309, 316 (D.C.Cir.1982); Forsyth v. Kleindienst, 599 F.2d 1203, 1208-1209 (3d Cir.1979), cert. denied, 453 U.S. 913, 101 S.Ct. 3147, 69 L.Ed.2d 997 (1981) (Forsyth I ); Forsyth v. Kleindienst, 700 F.2d 104 (3d Cir.1983) (Forsyth II ). The majority, however, has concluded that Harlow is not controlling and that these appeals do not meet the four criteria of the collateral order exception to 28 U.S.C. Sec. 1291. I disagree. In my opinion, if ever there was a case which justified application of Harlow and the collateral order doctrine, this is certainly the one.[2]
 
 II.
 
 34
 Official immunity has long been recognized as a concept essential to the effective functioning of government. Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). As noted by the Supreme Court in Scheuer v. Rhodes, 416 U.S. 232, 239, 94 S.Ct. 1683, 1687, 40 L.Ed.2d 90 (1974), officials, including a state's chief executive officer and his aides, must be permitted "to perform their official functions free from the threat of suits for personal liability." The Supreme Court in Harlow expressed its frustration with the increasing burdens imposed on public officials in defending against "insubstantial claims" and made clear that suits brought against public officials for alleged constitutional torts should be screened at the earliest stages of litigation:
 
 
 35
 In Butz, we admonished that "insubstantial" suits against high public officials should not be allowed to proceed to trial. 438 U.S., at 507 [98 S.Ct. at 2911] ... We reiterate this admonition. Insubstantial lawsuits undermine the effectiveness of Government as contemplated by our constitutional structure, and "firm application of the Federal Rules of Civil Procedure" is fully warranted in such cases. Id., at 508 [98 S.Ct. at 2911].
 
 
 36
 457 U.S. at 819, 102 S.Ct. at 2739, n. 35.
 
 
 37
 Accordingly, the Supreme Court departed from the earlier requirement that in order to be entitled to qualified immunity an official must show both objective and subjective good faith. Under Harlow, it is sufficient for purposes of good faith immunity if the conduct in question did not violate clearly established rights which a reasonable person would have known. In recasting this standard, the Harlow Court noted:
 
 
 38
 [I]t cannot be disputed seriously that claims frequently run against the innocent as well as the guilty--at a cost not only to the defendant officials, but to the society as a whole [footnote omitted]. These social costs include the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office. Finally, there is the danger that fear of being sued will "dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties." Gregoire v. Biddle, 177 F.2d 579, 581 (CA 2 1949), cert. denied 339 U.S. 949 [70 S.Ct. 803, 94 L.Ed. 1363] (1950).
 
 
 39
 457 U.S. at 814, 102 S.Ct. at 2736.
 
 
 40
 As the District of Columbia Circuit held in McSurely, the Supreme Court in Harlow "consciously sought to facilitate summary disposition of insubstantial claims against governmental officials. Consequently, ... appellate review of a denial of a motion for summary disposition must be available to ensure that government officials are fully protected against unnecessary trials under qualified immunity on the same basis as for absolute immunity." 697 F.2d at 316. Similarly, the Third Circuit in Forsyth II, 700 F.2d at 105, stated that a claim of absolute immunity "... protects a right not to be subjected to trial--a right that is lost if appellate review awaits final adjudication. It follows therefore, that a stay [of the trial] must be granted or the defendant will be deprived of the benefits of adjudication before trial."
 
 
 41
 The majority, however, rejects the McSurely and Forsyth II analysis. It stresses in Part I of its opinion that, because plaintiffs seek reinstatement to their former jobs as well as damages, appellants must proceed to trial in any event, and, therefore, the denial of immediate appellate review does not result in an irretrievable loss to appellants. This mistaken view ignores the fact that neither Governor Rockefeller nor District Engineer Gilbertson are proper parties for injunctive relief.[3] Furthermore, the majority's holding can easily lead to the pernicious practice of tacking on a claim for injunctive relief in order to avoid summary judgment and force officials to go to trial on meritless damages actions. In an appropriate case, the majority's rationale might have merit. It can have no application, however, in a case such as this, where public officials are contesting the right to be haled into court in their personal capacities[4] and face trial on what is clearly an insubstantial claim for damages.[5]
 
 III.
 
 42
 Nor can I accept the majority's conclusion in Part II of its opinion that these appeals do not present a serious and unsettled question and thus fail to meet another requirement of the collateral order doctrine. Under the Supreme Court's plurality opinion in Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) and its holding in Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), nonpolicymaking, nonconfidential government employees may not be discharged from a job solely because of their political party affiliation. Beyond that, the reach of Elrod and Branti is simply not as clear as the majority would like to believe, and whether Elrod governs a case such as this, where the terminations were motivated at least in part by a fiscal crisis, is open to serious question.
 
 
 43
 As recognized in Abraham v. Pekarski, 537 F.Supp. 858, 863-64 (E.D.Pa.1982):
 
 
 44
 Few Supreme Court decisions in recent years have generated as much litigation and controversy as have Elrod and Branti. Moreover, because of the lack of a majority opinion in Elrod, a problem not cured by Branti, the sweep of Elrod and Branti has been subject to a good deal of critical analysis seeking to assess their reach [footnotes omitted].[6]
 
 
 45
 The decisions of our own Court reflect the continued uncertainty surrounding Elrod's scope and applicability. In Ramey v. Harber, 589 F.2d 753 (4th Cir.1978), cert. denied, 442 U.S. 910, 99 S.Ct. 2823, 61 L.Ed.2d 275 (1979), this Court noted the factual distinctions between that case, which involved a newly elected sheriff's failure to rehire deputies who had actively campaigned against him, and the Elrod case. Although the majority found it unnecessary to determine the applicability of Elrod to the Ramey facts, it nonetheless expressed its reservations in this regard: "The district court's decision is supported by the broad sweep of the Elrod plurality, but there is considerable uncertainty as to how a majority of the Supreme Court would treat a failure to rehire and other patronage practices." 589 F.2d at 757.[7]
 
 
 46
 Courts in other Circuits have also wrestled with the meaning of Elrod. In spite of the majority's view that the Seventh Circuit's decision in Wren v. Jones, 635 F.2d 1277 (7th Cir.1980), cert. denied, 454 U.S. 832, 102 S.Ct. 129, 70 L.Ed.2d 110 (1981), is of no aid to appellants, I find that case instructive. In Wren, the Seventh Circuit was called upon to weigh the fiscal interest of the State against the Elrod rights of public employees in Illinois. In this connection the Wren Court held that "[i]n view of the involuntary requirement that [certain] plaintiffs be reinstated, and of the fiscal exigencies, ... the State's interest in maintaining prudent control over the efficient use of their [sic] resources outweighs any minimal impact on the plaintiffs' right to political association." Id. at 1287. (emphasis added).
 
 
 47
 Whether or not Elrod applies in the instant case, where a substantial portion of the public employment sector had to be permanently eliminated for legitimate financial reasons, is, therefore, by no means clear and settled. Except for economic necessity, all of the plaintiffs would have remained in their DOH jobs in 1981. Thus, the applicability of Elrod to the facts of this case, and the constitutional violations which plaintiffs assert, are highly questionable and at the very least justify pre-trial review by this Court under the collateral order doctrine.
 
 IV.
 
 48
 The majority's denial of pre-trial review under the circumstances presented in this case flies in the face of Harlow and conflicts with decisions by other Circuit Courts which have allowed immediate review of the denial of official immunity claims. As a result, appellants have had their claims to qualified immunity conclusively resolved against them. They have irretrievably lost whatever claim they may have to official immunity, not only in this case, but possibly in the eight other related cases now pending against Governor Rockefeller, Commissioner Miller, and other District Engineers like Gilbertson. Denying appellate review irreparably harms not only these public officials, but also the public at large and the very concept of official immunity.
 
 
 49
 For the foregoing reasons, I would hold that we have jurisdiction of these appeals under the collateral order doctrine and would address the immunity claims on their merits.
 
 
 
 [1]
 Our dissenting brother suggests that Governor Rockefeller and District Engineer Gilbertson were not proper parties to this action insofar as injunctive relief is sought. If reinstatement were the only equitable remedy sought, complete relief might be obtainable if Highway Commissioner Miller, or his successor, was the only named defendant, but the plaintiffs also seek an injunction prohibiting all defendants from conspiring to violate plaintiffs' constitutional right to be free of discrimination in employment based entirely upon political party considerations. Commissioner Miller serves "at the will and pleasure of the Governor," W.Va.Code 6-7-2a, and is vulnerable to pressure from the Governor. Commissioner Miller is responsible for "the selection, employment, and effective organization of all Commission personnel--" W.Va.Code 17-2A-4. Doubtless it is he who sets broad policy, but he may act only through subordinates, such as District Engineer Gilbertson, who either makes specific personnel decisions within the guidelines set by the Commissioner or who, at least, may make recommendations to the Commissioner. We conclude that Governor Rockefeller and Engineer Gilbertson are proper parties insofar as injunctive relief is sought
 
 
 [1]
 The record in this case demonstrates that because of the state's fiscal crisis in late 1980, over 1,500 DOH employee positions were eliminated in 1981, the year of plaintiffs' terminations. As of now, more than 2,600 DOH employees have lost their jobs since the end of 1980. This represents an elimination of approximately one-third of the DOH workforce as it existed in late 1980
 
 
 [2]
 The majority's reference to the unpublished decision in Benford v. American Broadcasting Companies, Inc., et al., 707 F.2d 504 (4th Cir.1983), in no way deters me from finding Harlow applicable in this instance. The two cases are factually distinct. In Benford, we simply held that an immediate appeal of the district court's order denying summary judgment was not warranted when the qualified immunity defense was not finally determined and where the disappointed movants could still present facts at trial in support of their claim to immunity. In that case, the district court ruled that the Congressional staff defendants had acted beyond the scope of their authority and, therefore, lacked standing to assert a qualified immunity defense; however, in deciding against the Congressional defendants, the district court left open the possibility that they could prove certain facts at trial which would entitle them to qualified immunity. Here, on the other hand, all of the facts pertaining to the qualified immunity defense asserted by Governor Rockefeller and the other state officials have been presented and the district court has conclusively resolved their immunity claims against them
 
 
 [3]
 Under W.Va.Code Sec. 17-2A-4 (1983), only Commissioner Miller has the authority to order reinstatement
 
 
 [4]
 The majority concludes that it makes no difference whether the personal pocketbooks of appellants are at risk or not insofar as their distraction from official duties is concerned. This position, however, completely overlooks the fact that an official being sued personally for money damages may be required to retain private counsel at his own expense. Furthermore, the fear of being sued and held personally liable for damages is a far cry from a suit for reinstatement or injunctive relief, which public officials face regularly in the course of performing their duties. As the Supreme Court noted in Harlow, 457 U.S. at 813, 818, 102 S.Ct. at 2736, 2738, the threat of personal liability could deter all but the most resolute or irresponsible from discharging their public duties, or even from being willing to serve in public office
 
 
 [5]
 A review of the current state of the record quickly reveals the insubstantiality of plaintiffs' claim. Plaintiffs allege that appellants participated in a scheme to oust them from their jobs for political reasons, or that appellants knew, or should have known, that the terminations were illegal and did nothing to prevent them. These allegations, however, when submitted to the test of appellants' motions for summary judgment, are not supported by a single shred of evidence, and the majority cites none
 Appellants' affidavits substantiate their defense that the terminations were due to financial necessity and indicate that none of the appellants had any personal involvement whatsoever in plaintiffs' selection for discharge by another defendant, County Supervisor John Gum. That plaintiffs were discharged solely by Gum, and without consultation, is further supported by Gum's deposition, in which he stated that he alone made the decision to terminate plaintiffs.
 None of plaintiffs' submissions, in response to these affidavits and supporting documentation, in any way contradict appellants' evidence. In fact, one of plaintiffs' submissions, a deposition taken of Governor Rockefeller in connection with other litigation, reveals that political hiring and firing was specifically disavowed by the Rockefeller administration. It further demonstrates that 55% of the DOH employees terminated in 1981 were persons hired by Governor Rockefeller's administration, while only 38-39% of those terminated were persons hired by the former Republican administration.
 I am thus at a loss to understand the district court's rationale for allowing the damages claim to proceed to trial on the ground that "[p]laintiffs' response ... sets forth allegations which if assumed to be true for the purposes of this motion preclude summary judgment." Under Fed.R.Civ.P. 56(e), once a motion for summary judgment is made, "an adverse party may not rest upon the mere allegations or denials of his pleading." The rule requires the responding party to set forth specific facts showing that there is a genuine issue for trial or else have summary judgment entered against him. The district court's holding is incompatible with Rule 56 and mandates trial where there are mere allegations of politically motivated terminations. By dismissing these appeals, the majority seems to sanction this unwarranted practice.
 
 
 [6]
 Judge Aldisert of the Third Circuit Court of Appeals made the following observation in his concurring opinion in Loughney v. Hickey, 635 F.2d 1063, 1069 (3d Cir.1980): "I suggest that the various majority opinions in both Elrod and Branti are not capable of public comprehension."
 
 
 [7]
 Other decisions in this Circuit which reflect the continuing uncertainty over the scope of Elrod include: Delong v. United States, 621 F.2d 618, 625 (4th Cir.1980) (Dumbauld, J., concurring: "appellant's situation does not fall within Elrod. He has not been discharged, or threatened with discharge. He has simply been transferred ...") and Johnson v. Bergland, 586 F.2d 993, 996 (4th Cir.1978) (Hall, J., dissenting: "... the majority's reliance on Elrod v. Burns ... is misplaced; there the infringement of first amendment rights was direct and immediate, not indirect and speculative.")