Charles J. STEIN, Jr., Appellant,

v.

UNITED STATES, Appellee.

No. 86–776.

District of Columbia Court of Appeals.

Argued April 14, 1987.

Decided Oct. 15, 1987.

Stephen L. Braga, with whom Herbert J. Miller, Jr., and William W. Greenhalgh, Washington, D.C., were on the brief, for appellant.

Laura Ross Blumenfeld, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, Kenneth W. Cowgill, and Silvia L. Gonzalez, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before MACK, TERRY and ROGERS, Associate Judges.

TERRY, Associate Judge:

Appellant Stein was charged with one count of carrying a pistol without a license,[1] two counts of possession of an unregistered firearm,[2] one count of possession of ammunition without a registration certificate,[3] and two counts of possession of a prohibited weapon.[4] Stein moved before trial to dismiss all of these charges, asserting *inter alia* that he was immune from prosecution under D.C.Code § 6–2375(a) (1981). The motion was denied after a hearing, and Stein noted this appeal. The government has moved to dismiss the appeal for lack of jurisdiction. We hold that we have jurisdiction to decide the immunity issue, and to that extent we deny the government's motion. We agree, however, that we lack jurisdiction in this pretrial appeal to consider the other issues which Stein raises. On the merits of the immunity question, we hold that Stein is not immune from prosecution, and thus we affirm the trial court's ruling.

## I

Charles Stein, a retired police captain from California, now works as a security specialist and private investigator.[5] On several occasions, beginning in the early 1970's, he has performed various professional services for Senator Edward M. Kennedy. In the latter part of 1985 he was asked to travel with Senator Kennedy on a thirteen-day tour of South America and to ensure the Senator's protection throughout the trip, beginning in January 1986.

On January 6 Stein flew from his home in California to Dulles International Airport in Virginia to meet with the Senator and his entourage in preparation for the South American trip. From the airport Stein went to Senator Kennedy's home in McLean, Virginia, where a briefing conference was to be held the next morning. Originally it had been expected that the traveling party would go directly to the airport from the Senator's home. However, because the Senator had some last-minute business to do at his office on Capitol Hill, the departure plans were changed; it was agreed that everyone would leave from the Senator's office in the District of Columbia.

On January 7 Stein went with one of the Senator's aides by car to Capitol Hill. Stein was carrying with him two guns which he intended to take with him to South America in his capacity as a bodyguard on the trip. The weapons were unloaded, separated, and secured in a small canvas bag, along with a quantity of ammunition. Before entering the Russell Senate Office Building, where Senator Kennedy's office was located, Stein and the Senator's aide discussed what should be done with the weapons. They both agreed that the best thing to do would be to bring the weapons and ammunition into the building and leave them at the guard's desk while the two of them visited the Senator's office.

---

1. D.C.Code § 22–3204 (1981).

2. D.C.Code § 6–2311(a) (1981).

3. D.C.Code § 6–2361(3) (1981).

4. D.C.Code § 22–3214(a) (1981). All of the charges (except the ammunition charge) appear to be based on Stein's possession of the same two firearms.

5. The facts pertinent to this appeal are essentially undisputed. Our factual summary is based largely on Stein's own affidavit, which was filed in the trial court and is part of the record on appeal, on Stein's motion to dismiss and its supporting memorandum, and on the transcript of the hearing on that motion.

Stein entered the building, approached the Capitol Police officer's desk just inside the entrance, and identified himself as a security officer for Senator Kennedy. He told the officer that he had two unloaded guns and some ammunition in the bag and asked permission to leave them at the officer's desk. The officer asked whether Stein had a license to carry his weapons in the District of Columbia. Stein replied that he did not have such a license for the District of Columbia [6] and explained the limited purpose of his visit. Despite his explanation, he was placed under arrest by the Capitol Police for violating District of Columbia firearms laws.

After being arraigned, Stein was released on his own recognizance to accompany Senator Kennedy to South America. He later authorized his attorneys to inform the government that he "would formally relinquish" any interest he might have in the weapons.

## II

■ At the outset we must decide whether we have jurisdiction to review, in a pre-trial appeal, the trial court's ruling that Stein was not immune from prosecution under D.C. Code § 6–2375(a) (1981). We hold that we do have such jurisdiction under a narrow but well recognized exception to the rule against appeals from non-final orders.

By statute this court has jurisdiction of appeals from all final orders and judgments of the Superior Court. D.C.Code § 11–721(a)(1) (1981).[7] The trial court's order in this case is obviously not final, since the charges against Stein are still pending, and no ultimate judgment on the merits has been entered. The Supreme Court, however, has created a narrow exception to the rule of finality as a predicate for appellate jurisdiction. In *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), the Court recognized a "small class" of appealable, albeit non-final, orders "which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Id.* at 546. The courts of the District of Columbia have long recognized this "collateral order" doctrine. *See, e.g., United States v. Harrod,* 428 A.2d 30 (D.C.1981) (en banc); *Choco v. United States,* 383 A.2d 333 (D.C.1978); *United States v. Perkins,* 140 U.S.App. D.C. 76, 433 F.2d 1182 (1970).

The requirements of the doctrine are stringent and difficult to meet. In criminal cases especially, the collateral order exception to the final judgment rule is strictly construed:

To come within this "narrow exception" ... a trial court order must, at a minimum, meet three conditions. First, it "must conclusively determine the undisputed question"; second, it must "resolve an important issue completely separate from the merits of the action"; third, it must "be effectively unreviewable on appeal from a final judgment."

*Flanagan v. United States,* 465 U.S. 259, 265, 104 S.Ct. 1051, 1055, 79 L.Ed.2d 288 (1984) (citations omitted). We hold that the trial court's rejection of Stein's immunity claim meets all three of these tests.

The first requirement, whether a disputed question has been conclusively determined, has been satisfied in this case. The disputed question is whether Stein is immune from prosecution under D.C. Code § 6–2375(a). The trial court has conclusively ruled on that question, and its ruling has become the law of the case, not subject to reconsideration before final judgment (with certain limited exceptions not pertinent here). *See Kaplan v. Pointer,* 501 A.2d 1269, 1270 (D.C.1985) (citing cases); *United States v. Allen,* 337 A.2d 512 (D.C.

---

6. Stein was licensed, however, to use guns and to carry concealed weapons in the State of California, and he had all permits necessary to carry weapons in the countries to be visited on the Senator's trip.

7. We also have jurisdiction of appeals from certain interlocutory orders under D.C.Code § 11–721(a)(2) and (3) (1981), but neither of those provisions applies to this case.

1975). The second requirement has also been satisfied: the challenged ruling on the immunity issue is completely separate from the merits of the criminal prosecution. The Supreme Court "has recognized that a question of immunity is separate from the merits of the underlying action ... even though a reviewing court must consider the plaintiff's factual allegations in resolving the immunity issue." *Mitchell v. Forsyth,* 472 U.S. 511, 528–529, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985) (footnote omitted).

The government argues that the immunity issue is not separate from the merits because the statute on which Stein relies, D.C.Code § 6–2375(a), provides a defense on the merits of the criminal charges. The government's brief states that the "essential protection" of the statute is "against *conviction* of one whose possession was solely in order to surrender the firearm to police custody.... Appellant's right to avoid prosecution under § 6–2375(a), if in fact that right is established, can be vindicated by an acquittal at trial or on appeal." [Emphasis in original.] This argument ignores the plain language of the statute. Section 6–2375(a) expressly provides that compliance with its provisions "shall preclude the arrest and prosecution" of persons who voluntarily surrender their firearms. This provision of the Code does not merely provide a defense to a criminal charge; rather, it "specifically prevents the arrest or prosecution" of anyone to whom it applies. *Kuhn v. Cissel,* 409 A.2d 182, 186 (D.C.1979).[8]

This leads us directly to the third requirement of the collateral order doctrine, namely, that the ruling will be effectively unreviewable on appeal from a final judgment. It necessarily follows from what we have just said that this requirement is met here as well. Although it is too late to prevent Stein's arrest, his right to avoid prosecution (if he has such a right) cannot be "vindicated by an acquittal at trial or on

appeal," as the government asserts. "When that time comes, it will be too late effectively to review the present order, and the rights conferred by the statute, if it is applicable, will have been lost, probably irreparably." *Cohen v. Beneficial Industrial Loan Corp., supra,* 337 U.S. at 546, 69 S.Ct. at 1225. The Supreme Court's holding in *Mitchell v. Forsyth, supra,* supports our conclusion:

> The entitlement is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial. Accordingly, the reasoning that underlies the immediate appealability of an order denying absolute immunity indicates to us that the denial of qualified immunity should be similarly appealable: in each case, the district court's decision is effectively unreviewable on appeal from a final judgment.

472 U.S. at 526–527, 105 S.Ct. at 2816 (emphasis in original).[9] The question of whether Stein is immune is "effectively unreviewable" on appeal from a judgment of conviction because, if he is immune, he has a statutory right not to be tried at all. *See Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Nixon v. Fitzgerald,* 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982); *Helstoski v. Meanor,* 442 U.S. 500, 99 S.Ct. 2445, 61 L.Ed.2d 30 (1979). His "asserted right to [immunity] is forever lost if not resolved in [his] favor before jeopardy has attached." *Choco v. United States, supra,* 383 A.2d at 334; *accord, Bever v. Gilbertson,* 724 F.2d 1083, 1086 (4th Cir.), *cert. denied,* 469 U.S. 948, 105 S.Ct. 349, 83 L.Ed.2d 285 (1984).

For these reasons we hold that the trial court's order denying Stein's claim of immunity is immediately appealable as a collateral order, and that we have jurisdiction to review it in this pre-trial appeal.

---

**8.** *Kuhn v. Cissel, supra,* involved D.C.Code § 6–1875 (1978 Supp.), which has been recodified as D.C.Code § 6–2375 (1981).

**9.** Although the *Mitchell* case involved the issue of qualified immunity rather than absolute im-

munity from suit, that distinction is not relevant to the issue of immediate appealability. *See Mitchell v. Forsyth, supra,* 472 U.S. at 529 n. 10, 105 S.Ct. at 2817 n. 10.

## III

D.C.Code § 6–2375(a) (1981) provides:

If a person or organization within the District voluntarily and peaceably delivers and *abandons to the Chief* any firearm, destructive device or ammunition at any time, such delivery shall preclude the arrest and prosecution of such person *on a charge of violating any provision of this chapter* with respect to the firearm, destructive device, or ammunition voluntarily delivered. Delivery under this section may be made *at any police district, station, or central headquarters, or by summoning a police officer to the person's residence or place of business.* Every firearm and destructive device to be delivered and abandoned to the Chief under this section shall be unloaded and securely wrapped in a package, and, in the case of delivery to a police facility, the package shall be carried in open view. No person who delivers and abandons a firearm, destructive device, or ammunition under this section, shall be required to furnish identification, photographs, or fingerprints. No amount of money shall be paid for any firearm, destructive device, or ammunition delivered and abandoned under this section. [Emphasis added.]

We reject Stein's claim of immunity under this statute because he failed to comply with it in two respects: he did not deliver his weapons "to the Chief," and he did not "abandon" them at the time of delivery. Moreover, even if he were immune, he would be protected from prosecution only for violations of "this chapter," *i.e.*, chapter 23 of title 6 of the District of Columbia Code. Immunity under section 6–2375(a) is thus limited by the very language of that section; it does not extend to prosecutions for violations of D.C.Code § 22–3204 or 22–3214 (1981), with which Stein is also charged.

### A. *Delivery "to the Chief"*

█ Section 6–2375(a) requires a person seeking its protection to deliver any firearm "to the Chief ... at any police district, station, or central headquarters, or by summoning a police officer to the person's residence or place of business." In another section "Chief" is defined for the purposes of chapter 23 of title 6 of the Code, of which section 6–2375 is a part, as "the Chief of Police of the Metropolitan Police Department of the District of Columbia or his designated agent." D.C.Code § 6–2302(4) (1981). The legislative history states that what became section 6–2375 "provides a mechanism for the lawful surrender or abandoning of any firearm or ammunition to the Chief or to a Metropolitan police officer." Council of the District of Columbia, Committee on the Judiciary and Criminal Law, Report on the "Firearms Control Act of 1975" at 30 (April 21, 1976). The Metropolitan Police and the Capitol Police are two entirely separate police departments. *Compare, e.g.,* D.C.Code § 4–104 *with* D.C.Code § 9–115 (1981). *See also, e.g.,* D.C.Code § 4–127 (1986 Supp.) (prescribing uniform designs for four police forces, including both the Metropolitan Police and the Capitol Police); D.C.Code § 9–116 (1981) (authorizing the Mayor to detail Metropolitan Police officers to the Capitol Police). Significantly for the purposes of this case, Capitol Police officers are not and have never been designated agents of the Chief of the Metropolitan Police for the purpose of receiving firearms surrendered under D.C.Code § 6–2375(a).

Conceding this,[10] Stein argues nevertheless that under general agency principles the Capitol Police had the authority to accept the guns and ammunition from him in compliance with the firearms laws. His argument is based on a statute which, he maintains, makes the Capitol Police "designated ... agent[s] of the state" with the authority to arrest persons for violating any law of the District of Columbia, including the law prohibiting the possession of certain weapons. *See* D.C.Code § 9–115 (1981) (Capitol Police may "make arrests within the United States Capitol Buildings and Grounds for any violations of any law of the United States [or] of the District of

**10.** Stein acknowledges in a footnote in his brief that members of the Capitol Police are not designated agents of the Chief of the Metropolitan Police.

Columbia"). Because their agency status, he asserts, allows them to enforce District of Columbia law by making arrests, it also allows them to enforce the law by acting as recipients of weapons surrendered under section 6–2375(a).

We reject this argument for two reasons. First, although the Capitol Police have been given express authority under section 9–115 to arrest, they have no such express authority under section 6–2375(a) to take delivery of guns and ammunition. The statutory language and legislative history explicitly identify the authorized recipient to be the "Chief" or his designated agent, which includes only the Metropolitan Police, not the Capitol Police. Second, we do not read section 9–115 as creating an agency relationship. It gives to the Capitol Police the power to make arrests, but nowhere does it make them agents of the Metropolitan Police (or anyone else) for that purpose. Section 9–115 is an independent grant of arrest power to the Capitol Police, unrelated to any other powers which the Metropolitan Police may have under other statutes or regulations.

In addition to calling for delivery to the Chief of the Metropolitan Police or his designated agent, section 6–2375(a) also requires that the person in possession of the guns and ammunition deliver them "at any police district, station, or central headquarters, or by summoning a police officer to the person's residence or place of business." The guard desk in the Russell Senate Office Building, which is in a public hallway just inside the entrance, does not meet this requirement. Thus, even if the Capitol Police officer at that desk had been authorized to accept Stein's surrender of the firearms, that surrender could not validly take place there. The conclusion is inescapable that even if Stein's delivery of the weapons were otherwise in accord with the statute (which it was not; see part B, *infra*), he delivered them to the wrong person at the wrong place.

### B. *Abandonment*

■ Section 6–2375(a) bestows immunity on one who "delivers and abandons" firearms or ammunition to the appropriate police authority. Stein argues that he satisfied this requirement when he placed his guns and ammunition on the guard desk in front of the Capitol Police officer. We disagree. The facts unmistakably show that Stein delivered the guns and ammunition to the officer, but that he did not abandon them.

"Abandoned property is that to which the owner has voluntarily relinquished all right, title, claim, and possession, with the intention of terminating his [or her] ownership, but without vesting it in any other person, and with the intention of not reclaiming future possession or resuming its ownership, possession, or enjoyment." 1 AM.JUR.2D *Abandoned, Lost, and Unclaimed Property* § 1, at 3–4 (1962) (footnotes omitted). To be legally effective, therefore, an abandonment must be permanent and eternal; the owner must have "utterly and entirely relinquished" all hope and intent of recovering the property. *Id.* at 4 (footnote omitted). A person alleging an abandonment must prove both "an intent to abandon and an act or omission by which such intention is put into effect." *Block v. Fisher*, 103 A.2d 575, 576 (D.C. Mun.App.1954) (footnote omitted). Proof of that intent, moreover, must be clear and unequivocal. *International Finance Corp. v. Jawish*, 63 App.D.C. 262, 263, 71 F.2d 985, 986 (1934); *see Peyton v. United States*, 275 A.2d 229, 230 (D.C.1971) (citing cases). Stein presented no such proof to the trial court. On the contrary, Stein's affidavit indicates that he fully intended to retrieve the guns and ammunition from the police officer when he left the building so that he could take them with him on the trip to South America. Even in his brief on appeal he concedes that "[t]here was no question in the trial court that Stein had the intention of abandoning his weapons to the Capitol Police *until he was ready to leave* the Russell Senate Office Building and the District of Columbia" (emphasis added). This statement is in accord with the affidavit, but it is flatly inconsistent with a claim of abandonment. On the undisputed facts, therefore, we hold that Stein did not abandon the guns and ammunition, as the statute required him to do.

### C. *The Limited Scope of Immunity*

Stein asserts not only that he is immune from prosecution under D.C.Code §§ 6–2311 and 6–2361, but that his immunity extends to all the offenses with which he is charged. The plain language of the immunity statute refutes this assertion. Section 6–2375(a) states that compliance with its provisions "shall preclude the arrest and prosecution of [the person so complying] on a charge of violating *any provision of this chapter*" (emphasis added), referring to the chapter 23 of title 6 of the District of Columbia Code. "This chapter" is the Code's translation of a phrase in the original statute enacted by the Council of the District of Columbia. Section 6–2375 of the Code is derived from section 705 of the Firearms Control Regulations Act of 1975, D.C. Act 1–142, 23 D.C.Reg. 1091 (1976), which became effective as D.C.Law 1–85, 23 D.C.Reg. 2464 (1976). The immunity granted by section 705 was from prosecutions for violations of "this act." 23 D.C. Reg. at 1130. "This act," of course, was D.C. Act 1–142, later to become D.C.Law 1–85, which is now codified as chapter 23 of title 6 of the Code.

■ Stein maintains that we should nevertheless read the statutory language broadly, construing it as a grant of immunity from prosecution for any firearms offense when the firearms in question are surrendered in accordance with section 6–2375(a). He makes various arguments in favor of such a construction, but they all founder on the language of the statute itself. That language is clear and unambiguous, and nothing in the legislative history suggests that it means anything other than what it says. We can only conclude that the statute as written plainly states the intent of the Council to restrict its grant of immunity to violations of the Firearms Control Regulations Act of 1975.

### IV

Stein urges us to exercise our "discretion" and consider certain other issues on which the trial court also ruled. The government maintains that we lack jurisdiction to consider these issues in a pre-trial appeal. We agree with the government.

The jurisdiction of this court is not a discretionary matter; either we have jurisdiction or we do not. The case law is absolutely clear that in this instance we have no jurisdiction to entertain Stein's assignments of error other than the one pertaining to his claim of immunity. *Abney v. United States,* 431 U.S. 651, 662–663, 97 S.Ct. 2034, 2041–2042, 52 L.Ed.2d 651 (1977); *Gant v. United States,* 467 A.2d 968, 970 (D.C.1983), *cert. denied,* 466 U.S. 952, 104 S.Ct. 2155, 80 L.Ed.2d 541 (1984); *see also United States v. MacDonald,* 435 U.S. 850, 98 S.Ct. 1547, 56 L.Ed.2d 18 (1978). "The fact that [an] issue ... is important, or even critical to the disposition of the case, is of no legal consequence in deciding the question of appellate jurisdiction." *Cohen v. Owens & Co.,* 464 A.2d 904, 906 (D.C.1983). Resolution of the other issues which Stein presses upon us must wait until a final judgment is entered.[11]

### V

We hold that we have jurisdiction to review the trial court's denial of Stein's motion to dismiss the indictment on the ground that he was immune from prosecution under D.C.Code § 6–2375(a) (1981). Even though a final judgment has not yet been entered, that denial is appealable as a collateral order. We further hold that the trial court's ruling on the claim of immunity was correct, and accordingly it is

*Affirmed.*

MACK, Associate Judge, concurring in part, dissenting in part:

I concur in Parts I, II, and IV of the majority opinion. However, because I believe that the majority's resolution of ambiguous terms in D.C.Code § 6–2375(a) (1981) leads to absurd consequences and thwarts the manifest purpose of the stat-

---

11. Because appellate review will ultimately be available if Stein is tried and convicted, we deny Stein's alternative request to treat his brief with respect to these other issues as a petition for a writ of mandamus.

ute, I cannot go along with the majority's rejection of Mr. Stein's claim of immunity in Part III.

Charles Stein is a former police captain and presently works as a security specialist and private investigator. Mr. Stein was to accompany Senator Edward M. Kennedy on a tour of South America to ensure the Senator's protection. Mr. Stein went to the Russell Senate Office Building, from where he and the Senator were to depart. He entered the office building and went directly to the Capitol Police officer's desk just inside the entrance. After identifying himself as a security officer for Senator Kennedy, he told the officer that he had two unloaded guns and a bag of ammunition, and asked permission to leave them at the desk. The officer asked Mr. Stein if he had a license for the weapons. He replied he did not,[1] and although he tried to explain to the officers the limited purpose of his visit, was placed under arrest by the Capitol Police for violating District of Columbia firearms laws.

Under the reasoning advanced by the majority, Mr. Stein has been placed under arrest for possessing unregistered firearms by officers who could not themselves legally receive into their possession the firearms turned over to them. The majority reaches this strange result by a strained construction of D.C.Code § 6–2375(a).

D.C.Code § 6–2375(a) provides:

If a person or organization within the District *voluntarily and peaceably* delivers and abandons to the Chief any firearm, destructive device or ammunition at any time, such delivery shall preclude the arrest and prosecution of such person on a charge of violating any provision of this chapter with respect to the firearms, destructive device, or ammunition voluntarily delivered. *Delivery under this section may be made at any police district, station, or central headquarters or by summoning a police officer to the person's residence or place of business....* [Emphasis added.]

---

**1.** Mr. Stein is a resident of the State of California and is licensed to use guns and to carry

Because Mr. Stein delivered his weapons to a Capitol police officer instead of a Metropolitan police officer, and allegedly did not intend to permanently abandon them, the majority finds him subject to prosecution.

### I. *The Proper Police Officer*

The first sentence of § 6–2375(a) describes generally the act of voluntary and peaceful delivery of the firearm which would result in immunity from prosecution. The second sentence describes places where delivery may be made. The statute provides for immunity from prosecution following the surrender/abandon of weapons to *"a police officer"* in a wide variety of situations; at *any* police district, station, or headquarters, or even at a person's home or business. D.C.Code § 6–2375(a) does not identify a specific type of police officer to whom the weapons must be delivered, and there is no indication in the Firearms Protection Act that the statutory term "police officer" is somehow confined to members of the Metropolitan Police Department.

D.C.Code § 6–2375(a) also provides for surrender of firearms to "the Chief." According to § 6–2302(4), "the Chief" means "the Chief of Police of the Metropolitan Police Department of the District of Columbia *or his designated agent*." Just who qualifies as a "designated agent" of the Chief, however, is unclear. Nowhere does the statute indicate that only *Metropolitan* police department members could be "designated agents" of the Chief.

The Capitol Police have been authorized by local statute to make arrests for the very firearms offenses at issue herein, *see* D.C.Code § 9–115.1, and have been designated as exclusive law-and-order custodians of Capitol buildings like the Russell Senate Office Building. *See* D.C.Code § 9–115; 40 U.S.C. § 112a. It is certainly arguable that a police officer who has been officially designated as an agent of the state for purposes of making arrests under the firearms law in these limited circumstances should

concealed weapons there.

have his agency status carried over into effecting compliance with other interrelated provisions of those very same firearms laws in the same limited circumstances. It is eminently reasonable, in any case, that a citizen would believe that such a police officer had the authority to accept surrendered weapons pursuant to the statute.[2]

## II. *Legislative History*

The majority concedes that the statutory language "designated agent" and "police officer" is not, on its face, clear, and resorts to searching the legislative history to ascertain who is an authorized recipient of surrendered/abandoned weapons. A statement in the committee report on the Firearms Control Act of 1975 to the effect that the provision would allow the lawful surrender or abandoning of any firearm or ammunition to the Chief or to a Metropolitan police officer is the majority's sole support for its conclusion that Mr. Stein is subject to prosecution because he surrendered his firearms to a Capitol police officer.

In my view, a single reference in the legislative history to the Metropolitan Police Department is insufficient evidence of legislative intent, given the absurd results such reliance generates and the manifest purpose of the statute. "It is a 'well-established principle of statutory interpretation that the law favors rational and sensible construction' ... [U]nreasonableness of the result produced by one among alternative possible interpretations of a statute is reason for rejecting that interpretation in favor of another which would produce a reasonable result." 2A SUTHERLAND ON STATU-

TORY CONSTRUCTION, § 45.12 at 54 (Sands 4th ed. 1985) (citations omitted). I simply cannot believe that the City Council, in drafting § 6–2375 (a), could have intended the arrest and prosecution of someone in Mr. Stein's situation.

## III. *Purpose of the Firearms Control Act Immunity Provision*

The City Council's primary purpose in enacting the Firearms Control Act of 1975 was "to reduce the potentiality for gun-related crimes and gun-related deaths occurring in the District of Columbia."[3] The prosecution of Mr. Stein—who was fully qualified to carry his weapons elsewhere, and was in the District for a very limited time and purpose—for failing to properly assess the distinction between a Capitol police officer and a Metropolitan police officer seems to me an unjust result (and, I might add, a waste of the government's resources). The hypertechnical statutory interpretation supported by the majority does nothing to promote the purposes of the statute. The public policy behind § 6–2375 is obviously to encourage individuals to surrender firearms to responsible police authorities so that those firearms will not be used in the District of Columbia. Nothing which Stein did would undermine that purpose. In fact, prosecuting Stein for choosing the wrong police officer to surrender his weapons to only works to discourage other citizens from being so forthcoming in the future.

## IV. *Eternal Abandonment*

The majority's conclusion that § 6–2375(a) requires a permanent abandonment

2. I note that it is not only the average citizen who might take for granted that Capitol Police officers (who are authorized to make arrests for the firearms offenses at issue here) were authorized recipients of firearms under the statute. When Mr. Stein attempted to determine from the MPD whether the Capitol Police were, in fact, designated agents of the Chief for these purposes, he was met with the following responses from three different individuals: "I think so, but I'm not really sure"; "I don't know"; and "I don't know."

3. The City Council enacted D.C.Code § 6–2375(a) against the backdrop of a body of well-

established caselaw providing an affirmative defense to one who possesses a pistol "for the purpose of turning it over to *law enforcement authorities,*" D.C.Criminal Jury Instruction No. 4.815B (emphasis added), or "furthering the aims of *law enforcement." Id.* (emphasis added). The criminal procedure chapter of the D.C.Code defines "law enforcement officer" to mean "an officer or member of the Metropolitan Police Department of the District of Columbia, *or of any other police force operating in the District of Columbia,* or an investigative officer or agent of the United States." D.C.Code § 23–501(2) (emphasis added).

**650**

is ostensibly based on the "plain language" of the statute. A statute's "language is plain" only if it "admits of no more than one meaning." *Davis v. United States,* 397 A.2d 951, 956 (D.C.1979) (citation omitted). The definition of "abandon" admits of several different meanings. Our decision that Mr. Stein is or is not subject to prosecution should not turn upon a definition of abandonment as meaning "eternal abandonment" when the term is also defined to mean a less than permanent surrender ("to give up, or cease to use"). *See* BLACK'S LAW DICTIONARY (5th ed. 1979).[4]

" 'The literal wording of a statute is a primary index but not the sole index to legislative intent. It cannot prevail over strong contrary indications in the legislative history *or so as command an absurd result.' " Citizens Association of Georgetown v. Zoning Commission,* 392 A.2d 1027, 1033 (D.C.1978), quoting *Lange v. United States,* 143 U.S.App.D.C. 305, 307–08, 443 F.2d 720, 722–23 (1971) (footnotes omitted; emphasis added). *See Peoples Drug Stores, Inc. v. District of Columbia,* 470 A.2d 751, 754 (D.C.19083) ("whenever possible, the words of a statute are to be construed to avoid 'obvious injustice' "); *Varela v. Hi-Lo Powered Stirrups, Inc.,* 424 A.2d 61, 65 (D.C.1980) (" 'the literal meaning of a statute will not be followed when it produces absurd results.' ") (quoting *District of Columbia National Bank v. District of Columbia,* 121 U.S.App.D.C. 196, 198, 348 F.2d 808, 810 (1965)).[5]

**4.** "Abandon. To desert, surrender, forsake, or cede. To relinquish or give up with intent of never again resuming one's right or interest. To give up or to cease to use...." BLACK'S LAW DICTIONARY 2 (5th ed. 1979).

**5.** *See also* 2A SUTHERLAND ON STATUTORY CONSTRUCTION, § 45.12 at 54 (Sands 4th ed. 1985) ("[D]eparture from the literal construction of a statute is justified when such a construction would produce an absurd and unjust result and would clearly be inconsistent with the purposes and policies of the act in question.").

The purpose of reducing the potential of gun-related crimes in the District of Columbia is not furthered by forcing a security specialist who has lawfully acquired and possessed firearms in another jurisdiction for use in the course of lawful employment, to make an irrevocable gift of these firearms to the Metropolitan police

Both the legislative history and the underlying purposes of the statute support a broad interpretation of the term "abandonment." Legislative history shows the term "abandonment" was used interchangeably with other terms. For example, § 6–2375 is discussed in terms of allowing for (1) the "surrender" or "the voluntary surrender" of firearms and ammunition; (2) "the lawful surrender *or* abandoning of any firearm or ammunition; and (3) an individual to voluntarily and peaceably surrender weapons and ammunitions." Firearms Control Regulation Act of 1975 (Council Act No. 1–142), Hearing and Disposition Before the Committee On The District of Columbia, House of Representatives, 94th Cong., 2d Sess. (August 25, 1976) at pp. 32, 40 & 66. Moreover, the interpretation of "abandon" as not necessarily an "eternal" abandonment is fully consistent with the City Council's primary purpose in enacting the Firearms Control Act of 1975. Its purpose was "to reduce the potentiality for gun-related crimes and gun-related deaths occurring *in the District of Columbia* " (emphasis added). This purpose will be as fulfilled by requiring an individual to abandon his weapons for as long as he is in the District of Columbia as it will be by requiring permanent abandonment.[6]

## V. *Conclusion*

The Supreme Court has ruled that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity."

when he surrenders them pursuant to a temporary entry. The majority's interpretation of "abandonment" comes close to that of "forfeiture"—*i.e.,* a result to be expected following misfeasance, crime, negligence, or omission. Mr. Stein did everything that he could do in an effort to comply with the law.

**6.** The majority's argument that, in any case, Stein did not deliver his weapons to a "police facility" is not persuasive. The statute provides not only for the surrender of weapons to any police district, station, or central headquarters, but also provides for an alternative surrender of one's weapons to a police officer [at] the person's residence or place of business. As Senator Kennedy's employee, the Russell Senate Office Building was plainly Stein's "place of business" in the District of Columbia on January 7, 1986.

*Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971). I feel that the majority's analysis relies far too heavily on a hypertechnical approach to the interpretation of ambiguous statutory language, generating an absurd and harsh result. To hold out a promise of immunity to citizens surrendering their firearms only to renege on that promise based on a narrow construction of ambiguous statutory language puts this court in danger of collaborating in the "sanction [of] the most indefensible sort of entrapment by the State—convicting a citizen for exercising a privilege which the State clearly had told him was available to him." *Raley v. Ohio*, 360 U.S. 423, 438, 79 S.Ct. 1257, 1266, 3 L.Ed.2d 1344 (1959); *accord, Cox v. Louisiana*, 379 U.S. 559, 571, 85 S.Ct. 476, 484, 13 L.Ed.2d 487 (1965). The underlying purposes of § 6–2375 are best served by permitting an interpretation befitting the broad language of the statute, and allowing Mr. Stein's relinquishment of his weapons to a Capitol police officer to render him immune from prosecution.

I respectfully dissent.