**Chang YOON, a/k/a Bright U. Yoon, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 90–764.**

District of Columbia Court of Appeals.

Argued May 21, 1991.
Decided July 16, 1991.

---

John W. Nields, Jr., with whom Gary H. Nunes, Washington, D.C., was on the brief, for appellant.

Philip S. Kushner, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Thomas C. Black, and Thomas J. Tourish, Jr., Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before ROGERS, Chief Judge, and FERREN and FARRELL, Associate Judges.

FARRELL, Associate Judge:

Appellant was found guilty by a jury of assault with a dangerous weapon (D.C.Code § 22–502 (1989)) and several weapons offenses. On appeal, his primary contention is that the government's failure to disclose a statement discoverable under Super.Ct.Crim.R. 16(a)(1)(A) (1990) until after its case-in-chief substantially prejudiced his defense of self-defense to the assault charge. The trial judge was troubled by this issue but declined to set aside the verdicts on a post-trial motion for new trial because he concluded that appellant had not demonstrated sufficient prejudice from the nondisclosure. Mindful of the deference we accord such determinations by the trial judge, we nevertheless hold that the nondisclosure violated Rule 16 and caused prejudice to appellant sufficient to require a new trial. We also hold that the evidence was insufficient to support appellant's conviction for carrying a pistol without a license, but reject his remaining contentions.

## I.

According to the government's evidence, on February 7, 1989, Maurice Williams and Roger Goodson, both eighth grade students, entered the Davis Market on Georgia Avenue while returning to school from lunch. Williams began playing with a wind-up toy, and appellant, who owned the store, told him to stop. When Williams refused, appellant told him a second time to put the toy down and ordered him out of the store. A scuffle ensued as appellant grabbed Williams by the back of the collar and belt and pushed him out the door.

Williams stood by a tree in front of the store while Goodson paid appellant for some candy. When Goodson joined him, Williams asked Goodson to give him a bottle, then himself picked up a bottle from the ground and held it. Appellant, who was standing in the doorway of the store, told Williams he was going to shoot him; Williams therefore threw the bottle "towards the wall" beside the door, attempting to scare appellant. Williams and Goodson then turned to run away, but Williams, after having run a few steps, heard a gunshot and realized that appellant had shot him. He turned and saw appellant standing in the doorway with a small handgun in his hand. Williams, according to his testimony, did not have a gun in his possession and did not put his hand in his pocket after he threw the bottle. He ran home and his mother called the police. Later, at the hospital, a bullet was removed from his back which had entered from the right side and crossed to the left side of the back without exiting.

Appellant's primary defense was self-defense. He testified that during the eleven years he operated the Davis Market he had been held up at gunpoint at least six times and shot at twice; the most recent holdup was four days before the present events.[1] On the February 7 occasion, Williams and Goodson came into the store and began picking up merchandise, tossing it in the air, and demanding of appellant "is there anything free" and "can I have some money." After telling them repeatedly to leave the merchandise alone, he ordered them out of the store. When they twice refused, he came out from behind the counter to eject them from the store; as he did so he saw what appeared to be the bulge of a handgun in Williams' right pants pocket. He grabbed Williams and pushed him outside the door.

---

1. He claimed that twice he had wounded his assailant and each time he did so he called the police, who came to the store and apprehended the robber.

While standing next to a tree box a few feet from the store entrance, Williams picked up a large soda bottle and threw it at appellant's head, but appellant closed the door, using it as a shield, and the bottle shattered against the plexiglas door. Appellant reopened the door and immediately saw Williams appear to be pulling a gun from his right pants pocket. "[S]cared to death," he yelled to Williams to stop pulling the gun, but Williams continued until appellant could see the "dark part of the handgun handle." Appellant then pulled his own handgun from his pocket and, as he saw "part of [the] handle . . . part of the chamber of [Williams'] gun," fired a shot which struck Williams, who then ran away with Goodson.

Appellant's defense, in sum, was that he shot Williams in fear that that latter was about to shoot him, in a manner appellant was only too familiar with from experience. Both Williams and Goodson, by contrast, denied that Williams had carried a gun.

## II.

Appellant's main contention on appeal is that the government's failure to disclose a statement he had made to police officers at the scene until after completion of the government's case-in-chief violated Super.Ct.Crim.R. 16 and resulted in serious prejudice to his claim of self-defense. To analyze this contention, we first set forth the facts pertaining to the nondisclosure, inquire next whether the statement fell within the prosecution's duty of disclosure under Rule 16 (a point disputed by the government), and then consider the trial judge's refusal to grant a new trial because of his belief that appellant had shown insufficient prejudice.

### A. The Facts

On July 25, 1989, counsel for appellant conducted a discovery conference with an Assistant United States Attorney and requested all oral and written statements made by appellant producible under Rule 16(a)(1)(A).[2] As relevant here, the government furnished counsel with three statements: (1) a copy of the tape of a 911 telephone call made by appellant to the police department moments after the shooting on February 7, 1989, in which he exclaimed that two men had just tried to "kill" him but did not state that the weapon was a gun; (2) audio and transcribed versions of appellant's recorded statements made to Detective Brown at the police station later on February 7, in which he repeatedly claimed to have seen what appeared to be the outline or bulge of a gun in Williams' pocket as Williams began pulling his hand from the pocket; and (3) audio and transcribed versions of appellant's grand jury testimony in which he similarly explained that he had seen the "bulge" of a gun in Williams' right pants pocket and that he had fired a shot after Williams refused his command not to pull his hand from the pocket.

In keeping with the latter two statements but embellishing slightly the claim that appellant saw the bulge or shape of a gun in Williams' pocket, appellant's counsel announced in opening statement at trial that appellant would testify that he repeatedly told Williams to stop reaching into his pocket but that Williams did not stop. Instead he appeared to be removing a gun from his pocket: "Mr. Yoon will tell you that he saw what appeared to be the butt end of something metal, and he shot. Mr. Williams then ran away." After the government rested and shortly before the defense was to begin its case, appellant's counsel told the court that the prosecutor had informed him that morning, for the first time, of an additional oral statement made by appellant to other officers who had responded to the scene of the shooting. The prosecutor confirmed the existence of this statement, made "after the police offi-

---

**2.** Rule 16(a)(1)(A) provides in part:

Upon request of a defendant the prosecutor shall permit the defendant to inspect and copy . . . the substance of any oral statement which the government intends to offer in evidence at the trial made by the defendant whether before or after arrest in response to interrogation by any person then known to the defendant to be a government agent. . . .

cers went to the scene and asked [appellant] and had a conversation with him about what happened." According to the prosecutor, in this statement "Mr. Yoon did not mention anything about a gun being in the possession of either of these young men." The prosecutor regretted the belated disclosure[3] and explained that, as a result, he was not seeking to introduce the statement itself in evidence but rather, in the event appellant took the stand, wanted to impeach his testimony with his *failure* to mention seeing a gun in Williams' possession during this 20–40 minute conversation.

Defense counsel objected to any use of the statement in light of the nondisclosure. There followed into the next trial day lengthy arguments about the government's intended use of appellant's "omission." The prosecutor argued that the failure to mention a gun was not a "statement" within the meaning of Rule 16, since he did not intend to question appellant about "the contents of the statement, nor do I plan to ask the police officer [Sergeant Beemer] about the contents of the statement." In any case, he argued, appellant could not claim surprise since even without the disclosure, "I can't imagine that they didn't know that Mr. Yoon talked to the officer on the scene." The trial judge appeared to accept the notion that Rule 16 did not apply because the contents of the statement, "as opposed to the fact that he talked," were not going to be used to impeach appellant. Defense counsel replied that the fact of the statement was irrelevant "unless it is in the context of Mr. Yoon describing the events to these people and leaving something out. And I say that is using a statement that was not disclosed." Although finding the issue "very difficult and troublesome," the judge ruled that he would allow the prosecutor to impeach appellant with "the fact of a discussion" with Sergeant Beemer and "the absence of a particular kind of statement [to the officer] by Mr. Yoon."

On cross-examination of appellant, the prosecutor elicited that several officers had responded to the scene and "asked [appellant] what happened." Appellant acknowledged that he had talked to the police for about 45 minutes in the store. In response to the question, "Now, during that 45 minute conversation with Sergeant Beemer, you never told him that either of these kids had a gun, did you?" appellant insisted that he had told the police he saw the "bulge and part of the gun" in Williams' pocket. In rebuttal, the prosecutor called Sergeant Beemer who testified that he had spoken to appellant at the scene and that appellant never mentioned anything about "the two kids having a gun or ... about [appellant] thinking they had a gun." In closing argument, the prosecutor relied on this impeachment in both opening and rebuttal, citing it as partial proof that appellant's claim of having seen a gun was "a creation that he has added to the story along the way and embellished step-by-step until he arrived in court this week."

After the jury returned verdicts of guilty, appellant filed a motion for a new trial and the judge reconsidered the correctness of his earlier ruling. He concluded:

> By introducing the Defendant's omission the government necessarily introduced the substance of the non-disclosed statement, if not its language. Otherwise, the omission would be devoid of meaning germane to this case and excludable on relevance grounds.

Nevertheless, the judge declined to grant a new trial because he concluded that appellant had not demonstrated substantial prejudice from the nondisclosure. He acknowledged that if prejudice were evaluated in terms of the use the government made of appellant's statement, some prejudice had been shown because the prosecutor "relied heavily on this piece of evidence" in cross-examination and argument, and its use therefore "affected the outcome of the trial

---

**3.** He stated, "I thought they had been disclosed. I am sorry they weren't but I wish they had

to some degree."[4] The judge also analyzed prejudice, however, from the standpoint of the effect of the nondisclosure on appellant's conduct of the trial. First, he noted that on *direct* examination appellant had testified to "the fact that a statement was made and its general contents" before the prosecutor ever used the omission to impeach, despite the fact—as the judge recalled—that his ruling permitting the impeachment had been provisional, subject to additional argument by defense counsel before impeachment with the omission began. Second, the judge ruled that appellant had failed to take steps to ameliorate any prejudice from the late disclosure, such as requesting a mistrial or continuance to investigate the circumstances of the statement.[5] Third, the judge noted that appellant had learned of the statement before his testimony and hence in time to reconsider his decision to take the stand. Finally, the judge found that appellant had not claimed any specific prejudice from the nondisclosure. Ultimately, in the judge's view, "without trying to engage in unwarranted second guessing of the defense camp, ... given the nature of this case there's really nothing [defense counsel] could have done ... even if [the judge's] ruling had not been what it [was]"; "things would have turned out to be about the same." The judge therefore denied the motion for a new trial.

## B. *Discoverability under Rule 16*

■ The government renews the argument, made below, that appellant's *failure* to tell Sergeant Beemer that he had seen a gun was not itself a statement within Rule 16(a)(1)(A), and hence there was no nondisclosure to begin with. Upon reconsideration, the judge found that by impeaching appellant with the omission the government "necessarily introduced the substance of the non-disclosed statement, if not its

language." We agree and hold that the "substance" of a statement under Rule 16(a)(1)(A) may, under circumstances such as here, include what it does not say as well as what it says.

The rule requires the government, in part, to disclose upon request "the substance of any oral statement" made by the defendant in response to police interrogation and which the government intends to use at trial. *See Thomas v. United States*, 444 A.2d 952, 953 (D.C.1982). "Substance" in this context "connotes disclosure in enough detail to minimize the undesirable effects of surprise at trial and otherwise contribute to the fair and efficient administration of criminal justice." *Smith v. United States*, 491 A.2d 1144, 1147 (D.C.1985) (citation and internal quotation marks omitted). "Substance" thus must be understood functionally by reference to the purposes of Rule 16, including avoidance of unfair surprise.[6] It follows that if the primary—indeed here the only—use the government intends to make of a statement at trial is to impeach with an omission in what otherwise plainly would be a statement to the police, that omission is part of the "substance" of the statement. Appellant's failure to mention seeing a gun was, for Rule 16 purposes, the same as a statement that appellant saw no gun. *Cf.* 3A J. WIGMORE, EVIDENCE § 1042 (Chadbourn rev. 1970) ("[A] failure to assert a fact, when it would have been natural to assert it, amounts in effect to an assertion of the non-existence of the fact and constitutes a prima facie inconsistency"); *Hill v. United States*, 404 A.2d 525, 531 (D.C.1979), *cert. denied*, 444 U.S. 1085, 100 S.Ct. 1042, 62 L.Ed.2d 770 (1980).

The prosecutor's intent to use the omission only conditionally in the event appellant testified does not take it outside the reach of Rule 16. *See Lewis, supra* note 6,

---

been."

**4.** Most of the judge's reasoning was set forth in his written denial of the motion for a new trial, but he made additional statements at the sentencing proceeding and the argument on the issue of bail pending appeal held the same time the new trial was denied.

**5.** The judge recalled that he had "invited" a request for a continuance by appellant, but the government does not dispute the fact that the record reflects no such invitation.

**6.** *See United States v. Lewis,* 167 U.S.App.D.C. 232, 236, 511 F.2d 798, 802 (1975).

167 U.S.App.D.C. at 234–35, 511 F.2d at 801–02. Nor does it matter that, as the prosecutor noted at trial, appellant certainly knew he had talked to the police at the scene; it is not the fact of the statement to the police but its "substance" that the rule requires be disclosed.[7] What the defense did not know until the close of the government's case was that one of the officers would testify and claim that appellant told him something materially different from what appellant told Detective Brown in a recorded statement a short time later.[8]

### C. Prejudice

██ We turn then to the question of whether appellant was prejudiced by the late disclosure sufficiently to require a new trial. Had the trial judge correctly found at trial—as he later determined—that the statement to Sergeant Beemer including the failure to mention a gun was properly discoverable under Rule 16, he then would have faced the question whether sanctions should be imposed for the nondisclosure and if so what sanctions. *See* Super.Ct.Crim.R. 16(d)(2). We have said:

> Although undisclosed evidence may have been properly subject to discovery, Rule 16 does not require a court to impose sanctions against the nondisclosing party. Rather, in considering the imposition of sanctions, the court must consider a number of factors, including the reason for nondisclosure, the impact of nondisclosure, and the impact of the proposed sanction on the administration of justice.

*Wiggins v. United States*, 521 A.2d 1146, 1148 (D.C.1987). This court will review the trial court's application of these factors only for abuse of discretion, *id.*, provided that the choice of sanctions (if any) rests "on a firm factual foundation and [is] supported by substantial reasoning." *Id.* (cit-

ing *Johnson v. United States*, 398 A.2d 354, 364–65 (D.C.1979)).

The trial judge did not engage in this weighing of considerations because of his mistaken belief that the statement to Sergeant Beemer was not discoverable. Had appellant raised the Rule 16 error in this court without first citing it to the judge in a motion for a new trial under Rule 33, this court's decision in *Davis v. United States*, 564 A.2d 31 (D.C.1989) (en banc), suggests the approach we would have taken. We would have remanded the case to the trial judge to consider, albeit after the fact, whether denying the government use of the statement (rather than imposing some lesser remedy such as a continuance) would have been the appropriate sanction and, if so, what impact the failure to exclude had on the outcome of the trial. Given the judge's unique operational vantage point, *id.* at 34, we would have accorded deference to his conclusion on these issues, while recognizing our own independent duty to evaluate for harmless error. *Id.* at 40–41. In this case, however, the issue of a remand is mooted because appellant provided the judge with the opportunity to make both determinations on the new trial motion. Our standard of review of the judge's action, therefore, must be similarly deferential while bearing in mind our duty to assess independently the effect of any error in not excluding the statement on the outcome of the trial. *See Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *Lee v. United States*, 385 A.2d 159, 163 (D.C.1978).

Still, review of the judge's ruling is complicated by his conclusion, on the one hand, that except for his error on the issue of producibility he would have excluded the

---

7.  Discovery of the government's evidence of relevant and incriminating statements made by a defendant to police is of the utmost importance to the preparation of the defense as it must be kept in mind that given the traumatic circumstances of arrest the memory of a defendant as to exactly what occurred may well be hazy and defective. Even where a defendant's memory is crystal clear, it is not

every defendant who chooses to tell his own attorney all that he remembers.
*Lewis, supra* note 6, 167 U.S.App.D.C. at 236, 511 F.2d at 802.

8.  The government's additional argument that appellant's statement to Sergeant Beemer was not in response to "interrogation" but rather volunteered lacks sufficient support in the record.

statement at trial[9] and, on the other, that a key reason appellant had not shown sufficient prejudice was the availability of a lesser remedy for the nondisclosure, a continuance, which appellant had not requested. Appellant argues that we must proceed directly to the issue of harmless error under *Kotteakos* because the judge ruled that he would have excluded the statement, but the record is not clear on this point; the reference to a continuance suggests that the court might have imposed a lesser remedy. Under the appropriate standard of deference, therefore, we proceed to examine the reasons for the judge's conclusion that appellant had failed to demonstrate enough prejudice from the nondisclosure to necessitate a new trial.

First, the judge considered the prejudice to appellant to be something of a self-inflicted wound because, before the judge finally ruled that the prosecutor could impeach with the statement to Sergeant Beemer, appellant testified on direct examination to "the fact that a statement was made and its general contents," thus opening the door to the impeachment. This finding, however, lacks substantial support in the record. *Johnson v. United States*, 398 A.2d at 364–65. On direct examination appellant stated, in response to the question what happened when the police came to the store, "And then they asked what happened? That's when I explained what happened." He said nothing else about the contents of the statement. Even if we agree with the judge, however, that this testimony implied a consistency between appellant's statement to Sergeant Beemer and his later statement to Detective Brown (that he saw the bulge of a gun), we cannot agree that at the time appellant testified he

reasonably should have known the issue of his impeachment by his statement to Beemer was still open. At the end of a lengthy discussion on admissibility the judge stated, "I am certain enough [of the correctness of my ruling] that I am in a position to rule"; he therefore "overrule[d appellant's] objection to [the prosecutor's] cross-examination by omission." He did invite defense counsel to present "some new analytical angle on this issue" if he could, and stated that he would "take another three minutes between direct and cross" to "reflect further on the matter." But under the circumstances it cannot be said appellant was on notice that any mention of his statement to Sergeant Beemer on direct would amount to a waiver of his objection to use of the statement by the prosecutor as impeachment.[10] Indeed, the judge's post-trial acknowledgment that he had erred on the discoverability issue confirms that he had made up his mind at trial and would have allowed the impeachment whether or not appellant mentioned the statement on direct examination.

Second, the judge explained that he had offered appellant the chance to request a continuance to investigate the circumstances of the statement before taking the stand. As noted previously, note 5, the transcript reveals no such invitation. Given the judge's conclusion at trial that the statement was not discoverable under Rule 16, appellant argues, not implausibly, that the judge would not have been receptive to a mid-trial continuance as a remedy for the late disclosure. We need not answer that question, however, because there is additional reason why the opportunity for a mid-trial continuance was not an adequate

---

**9.** At sentencing the judge stated on the record: "I have determined ... that I was in error for allowing that statement to be used—allowing the omission to be used...."

**10.** Appellant had an unrelated tactical need to make at least the brief mention of his statement to Sergeant Beemer that he did on direct examination. Before trial he had moved for what amounted to dismissal of the charges of possessing an unregistered firearm and unregistered ammunition on grounds of immunity under D.C.Code § 6–2375(a) (1989). See part IV, *in-*

*fra.* His claim was that when he called the police following the shooting, he intended to "deliver and abandon" the weapon to the police within the meaning of that section, which he proceeded to do. The trial judge suggested, and appellant agreed, that evidence related to the immunity issue should be introduced concurrently with trial on the merits. In his testimony, therefore, it became necessary for appellant to describe briefly the context in which he surrendered the weapon to the officers when they arrived on the scene.

cure for prejudice in the circumstances of this case.

> [A] principal purpose of discovery is to advise defense counsel what the defendant faces in standing trial; it permits a more accurate evaluation of the factors to be weighed in considering a disposition of the charges without trial.

*United States v. Lewis, supra* note 6, 167 U.S.App.D.C. at 236, 511 F.2d at 802. Appellant argues that the contradiction between what he assertedly told Sergeant Beemer and his subsequent recorded statements, if confirmed at all by the other police officers who responded to the scene, was potentially devastating and if known before trial might have altered his decision to stand trial. The government replies that this is speculation; in light of Beemer's failure to record in any way appellant's statement to him, and appellant's assertion in his brief that "it is virtually inconceivable that [Beemer] had any but the dimmest memory of what Mr. Yoon had said," [11] it contends that there is no likelihood appellant would have changed his decision to put the government to its proof (or, indeed, to take the stand in self-defense) for fear of impeachment by his statement to Beemer had he known of it.

It is impossible to know with certainty what effect the nondisclosure had on appellant's pretrial planning, including the decision whether to seek a negotiated plea. A key purpose of Rule 16 is to avoid the need for such *post hoc* inquiry. What is certain, though, is that any investigation appellant undertook to confirm or rebut the force of Sergeant Beemer's expected testimony, *e.g.,* by interviewing Beemer and other officers who might have heard the statement,[12] would face significant obstacles if conducted during a mid-trial continuance after presentation of the government's case rather than before trial. In *Wiggins, supra,* we determined that a continuance on the *eve* of trial could have remedied the government's failure to produce an allegedly altered dollar bill which defendant had to examine to

prepare (and perhaps forgo) his defense of mistake. 521 A.2d at 1149. But examination of an item of physical evidence is very different from the need to interview—midtrial—possibly multiple police witnesses unlikely to cooperate in informal questioning once the government's case has been presented. Moreover, well before the prosecutor disclosed his intent to impeach with the statement to Beemer, appellant's counsel had outlined his client's testimony in opening statement and cross-examined Sergeant Moran, see note 12, *supra,* without the ability to anticipate and try to neutralize the expected impeachment by Sergeant Beemer. *Cf. Kitt v. United States,* 379 A.2d 973, 975 n. 2 & accompanying text (D.C.1977) (discussing advantage to defendant of being able to "defuse" adverse testimony—there prior convictions—by mentioning subject in own case). In short, there is considerably more than speculation to suggest that, as a result of the nondisclosure, appellant was disadvantaged in preparing his defense in a way that a midtrial continuance could not overcome.

For similar reasons, we are unpersuaded by the argument that appellant learned of the statement in time to reconsider his decision to testify, and hence to avoid impeachment by remaining off the stand. In opening statement his counsel had already declared appellant's intention to take the stand; and in this case in which appellant's sole defense to the assault charge was self-defense, not testifying was not a realistic option in any event. The point is that appellant was entitled by Rule 16 to disclosure of the statement in time to investigate its reliability and prepare to meet its force in the event he chose to stand trial.

It is true, as the trial judge pointed out, that appellant did not identify these specific forms of prejudice in his new trial motion, claiming only, in general terms, that the impeachment with the omission had undermined his credibility and "a significant element of his self-defense," his claim

---

**11.** Beemer testified at trial that he had been to 500 crime scenes since the time of appellant's statement to him.

**12.** At least one other officer, Sergeant Moran, was apparently in a position to hear part of the statement.

that he had seen a gun. But appellant cited and discussed the opinion in *United States v. Lewis, supra* note 6, which analyzes the prejudice inherent in an accused's not having statements he is entitled to under Rule 16. At bottom we think the judge's ruling rested on his perception, see page 1060, *supra*, that even had appellant received timely disclosure of the statement the outcome of the case would not have been different: appellant had committed himself to go to trial and to a defense that, in the circumstances, demanded his testimony and was an up-hill struggle at best. The government buttresses this reasoning by pointing to the fact that in his opening statement and testimony appellant was forced to embellish his claim of self-defense to include actually seeing the "metal" or handle and chamber of the gun—thereby inviting impeachment with statements furnished him before trial in which he claimed only to have seen the "bulge" of a gun.[13] Appellant's cross-examination of Sergeant Beemer, the government asserts, reveals that he was more successful at negating the damage from impeachment by his statement to Beemer than he was at dealing with the other inconsistencies in his various statements.

The issue is a close one but we cannot agree with the court's and the government's assessment. Admittedly there was evidence from which the prosecutor could argue, even without mentioning the statement to Beemer, that appellant's state-ments revealed a progressive effort to modify his story—from the original 911 call mentioning no gun, to his statement to Detective Brown mentioning a "bulge," to his trial testimony that he saw the handle and chamber—in order to improve the credibility of his defense. But as the trial judge recognized, appellant's failure to mention a gun at all in his first opportunity to discuss the incident with the police at length (20–40 minutes) was a substantial part of the government's proof in rebuttal and enabled the prosecutor to ask rhetorically in closing argument:

Do you think that Mr. Yoon's testimony at trial is believable when he, at the earliest times, two times before he was arrested,[14] he didn't mention anything about what he told you in this courtroom? I suggest that that creates very grave concerns about whether you should believe Mr. Yoon when he tells you he thought he saw a gun.[15]

Whether or not appellant would have defended and faced the very same impeachment had he known of the statement to Sergeant Beemer before trial is ultimately unanswerable, but the burden of persuasion on the issue cannot be appellant's. Under the circumstances of this case, and giving proper deference to the trial judge's assessment of prejudice, we must conclude that the prosecution's failure to disclose the statement to Beemer until the end of its case substantially prejudiced appellant and requires a new trial on the assault charge.[16]

---

**13.** *See Rosser v. United States,* 381 A.2d 598, 609 (D.C.1977) ("Nor is it likely that prejudicial error could have been shown if the improperly withheld statement, used for impeachment, merely had corroborated other statements in the hands of the police that defendant already knew about").

**14.** The second time the prosecutor referred to was the brief 911 call in which appellant exclaimed that two men had tried to "kill" him.

**15.** After defense counsel predictably attacked Sergeant Beemer's testimony in closing argument, the prosecutor returned to Beemer's testimony in rebuttal.

Now, let me address Sgt. Be[e]mer's testimony. Ask yourselves, given Sgt. Be[e]mer's position of investigating what happened at that time right after the incident. Don't you

think that he would have been listening just as he told you he was? Anything about a gun in his hand of these—one of these two kids, don't you think that was extremely important for the police at that time?

If that had been said by Mr. Yoon, do you think the police in this case, do you think Sgt. Beemer who you had a chance to evaluate from the stand is so incompetent, so uncaring that he would not take that into account?

Ladies and gentlemen, Sgt. Be[e]mer told you *Mr. Yoon didn't say anything about how he got*—the evidence is that he only brought that up after he was arrested when he came to court, he embellished the story a little more. It just does not wash.

**16.** The ground for reversing appellant's assault with a dangerous weapon conviction does not affect his convictions for possession of an un-

## III.

■ Appellant argues that the evidence was insufficient as a matter of law to support his conviction for carrying a pistol without a license. He relies on the exception in D.C.Code § 22–3204 allowing a person to carry an unlicensed pistol "in his ... place of business."[17] The government notes our decisions which impose on the accused the burden of bringing himself within this exception, *e.g.*, *Hines v. United States*, 326 A.2d 247, 249 (D.C.1974) (dwelling house exception). But that rule is satisfied when, as here, the defendant presents evidence that he has "a controlling, proprietary or possessory interest in the business premises in question." *Berkley v. United States*, 370 A.2d 1331, 1333 (D.C.1977); *see Williams v. United States*, 237 A.2d 539, 541 (D.C.1968) (under D.C.Code § 22–3204, "burden of proceeding with the evidence" as to application of exceptions lies with defendant). We have reviewed the testimony carefully and can find no evidence from which rational jurors could have found beyond a reasonable doubt that appellant left the Davis Market at any time while carrying the pistol. Both government witnesses, Williams and Goodson, testified only that appellant was "standing in the door" or "in the doorway" during the events in question. Although appellant testified—in a passage relied on by the government—that he "was standing in front of the store door" when he saw Williams reach for a gun, the evidence demonstrates that the door opened inward;[18] hence this statement confirmed the government's evidence that appellant at most stood in the doorway—in front of the open door—when carrying his weapon. Since there was no evidence that appellant set foot outside the store while possessing the weapon, his conviction for carrying a pistol without a license must be vacated.

## IV.

■ Appellant next contends that the trial court erred as a matter of law in rejecting his claim that he was immune from prosecution under D.C.Code §§ 6–2311(a) and 6–2361(3) for possessing an unregistered firearm and unregistered ammunition. He contends in the alternative that the court erred in not submitting these issues to the jury. Neither contention is persuasive.

The predicate of appellant's immunity claim is D.C.Code § 6–2375(a), which provides in part:

> If a person or organization within the District voluntarily and peaceably delivers and abandons to the Chief any firearm, destructive device or ammunition at any time, such delivery shall preclude the arrest and prosecution of such person on a charge of violating any provision of this chapter with respect to the firearm,

registered firearm and unregistered ammunition. As regards the carrying a pistol without a license conviction, the issue is mooted by our conclusion in part III, *infra,* that the evidence of guilt was insufficient on that charge. Although self-defense may be an affirmative defense to carrying a pistol without a license, *McBride v. United States*, 441 A.2d 644, 650 n. 11 (D.C.1982), we have never applied that rule to weapon and ammunition offenses under Title 6 of the D.C.Code. Nor need we decide in this case whether that application would be appropriate. Even as to carrying a pistol without a license, the availability of self-defense is "very limited," *Mitchell v. United States*, 302 A.2d 216, 217 (D.C.1973); an accused "cannot claim self-defense to justify possession of the weapon *before* its use in self-defense." *McBride*, 441 A.2d at 650 n. 11 (emphasis added); *Mitchell*, 302 A.2d at 217 (where person's life or safety is in imminent danger and he picks up pistol to ward off assailants, "possession *at that moment*" justi-

fies his obtaining and using the weapon in self-defense (emphasis added)). Here the record demonstrates unambiguously that appellant possessed the unregistered firearm and ammunition *before* he could claim that his life or safety was in imminent danger.

17. D.C.Code § 22–3204 provides in part:

> No person shall within the District of Columbia carry either openly or concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a pistol, without a license therefor issued as hereinafter provided....

18. Earlier, appellant had testified that Goodson walked past him to get out the front door. Asked whether he had had to open the door to let Goodson out, he replied, "No. Before I *close* the door, he get out from my store." (Emphasis added.) The clear implication from this is that the door opened inward.

destructive device, or ammunition voluntarily delivered. Delivery under this section may be made at any police district, station, or central headquarters, or by summoning a police officer to the person's residence or place of business. Every firearm and destructive device to be delivered and abandoned to the Chief under this section shall be unloaded and securely wrapped in a package, and, in the case of delivery to a police facility, the package shall be carried in open view.

At trial, appellant testified that when he called the police to the store he intended to surrender his gun to them as soon as they arrived; that he did hand them the gun; and that he did not expect the gun to be returned to him. These actions and this state of mind, he contends, constituted an abandonment within the statutory meaning.

In *Kuhn v. Cissel*, 409 A.2d 182 (D.C.1979), this court observed that the statute "sets forth the manner in which a person may voluntarily surrender or deliver a weapon." That manner includes the requirements that the firearm "be unloaded and securely wrapped in a package...." Appellant concedes that these requirements were not met, but asserts that they are directory, not mandatory. We find nothing in the statute or its purposes to support this view. In *Stein v. United States*, 532 A.2d 641 (D.C.1987), *cert. denied*, 485 U.S. 1010, 108 S.Ct. 1477, 99 L.Ed.2d 705 (1988), the court held that immunity was not available to an accused under § 6–2375 in part because he had not delivered his weapon "to the Chief," as required by the statute. The statutory language and legislative history explicitly identified the authorized recipient to be the Chief of the Metropolitan Police or one of his officers, whereas Stein delivered his

weapon to a member of the Capitol Police. Although the Capitol Police had the same powers to make arrests as the Metropolitan Police, the court read the statutory requirement literally and conditioned immunity on compliance with its explicit though strict requirements. We can think of no good reason for viewing as any less mandatory the requirement imposed by the legislature that a weapon surrendered to the police be unloaded and securely wrapped in a package. In essence these are statutory requisites of a good faith intent to surrender the weapon voluntarily.[19]

■ We reject as well appellant's contention that the immunity issue was for a jury rather than the court to resolve. Section 6–2375(a) does not provide a defense to a criminal charge but rather a bar to arrest and prosecution. By its nature, therefore, a claim under the section must be resolved by the court before trial since, much like a claim of double jeopardy, it challenges "the very authority of the Government to hale [the accused] into court to face trial on the charge against him." *Abney v. United States*, 431 U.S. 651, 659, 97 S.Ct. 2034, 2040, 52 L.Ed.2d 651 (1977). Indeed, for that reason a denial of a motion to dismiss on § 6–2375(a) grounds may be appealed interlocutorily, *Stein, supra,* 532 A.2d at 643–44, a result that does not change merely because the court may have to consider "factual allegations" in ruling on the motion. *Id.* at 644 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 528–29, 105 S.Ct. 2806, 2816–17, 86 L.Ed.2d 411 (1985)). Even claims of wrongful prosecution—such as selective or vindictive prosecution—not tantamount to a claim of immunity are routinely considered issues of law for the court to resolve rather than the jury.

### V.

In summary, the judgments of conviction for possession of an unregistered firearm

---

19. We note, moreover, although unnecessary to our decision, that Sergeant Moran testified that appellant produced the gun from his pocket only after the officer "asked him where is the gun." Notwithstanding appellant's testimony that he intended to surrender the gun from the moment he called the police, the evidence would appear to fall short of establishing "clear[ly] and unequivocal[ly]," *Stein,* 532 A.2d at 646, his intent to abandon the firearm.

and unregistered ammunition are affirmed, the judgment of conviction for carrying a pistol without a license is reversed for insufficient evidence, and the judgment of conviction for assault with a dangerous weapon is reversed and the case remanded for a new trial on that charge only.

*So ordered.*